No. 99-445

IN THE SUPREME COURT OF THE STATE OF MONTANA

2000 MT 289

302 Mont. 254

14 P.3d 473

IN THE MATTER OF INQUIRY INTO

J.L. and D.L.,

Youths in Need of Care.

APPEAL FROM: District Court of the Tenth Judicial District,

In and for the County of Fergus,

The Honorable John R. Christensen, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Hon. Joseph P. Mazurek, Attorney General; Tammy K. Plubell,

Assistant Attorney General; Helena, Montana

Thomas P. Meissner, Fergus County Attorney, Lewistown, Montana

For Respondents:

Damon L. Gannett, Attorney at Law, Billings, Montana

(Respondents Martha Meador Smith and Terry and Carolyn Goerger)

Mariah Eastman, Attorney at Law, Lewistown, Montana

(Respondents John C. Lawhead, Jr. and Marion and John C. Lawhead, Sr.)

Submitted on Briefs: April 20, 2000
Decided: November 16, 2000

Filed:

_____

Clerk

Justice Terry N. Trieweiler delivered the opinion of the Court.

¶1 The Department of Public Health and Human Services (DPHHS) brought this action in the District Court for the Tenth Judicial District in Fergus County for Temporary Investigative Authority (TIA) and Temporary Legal Custody (TLC) of J.L. and D.L., whose father, John, pled guilty to the negligent homicide of their mother, Nancy. John stipulated to DPHHS's TIA and TLC over J.L. and D.L. Subsequently, John filed a motion to terminate DPHHS's TIA and TLC, and filed a Notice of Temporary Custody, granting custody of his children to his parents. Following a hearing, the District Court ordered that J.L. and D.L. were not youths in need of care and dismissed DPHHS's petition for TLC. The District Court further ordered that it would retain jurisdiction over the case pursuant to the custody agreement executed between John and his parents which stipulated to the District Court's continuing jurisdiction. DPHHS appeals from the District Court's order. We affirm the judgment of the District Court.

¶2 The following issues are presented on appeal:

¶3 1. Did the District Court abuse its discretion when it concluded that J.L. and D.L. were not youths in need of care?

¶4 2. Did the District Court have authority to retain jurisdiction after it had concluded that J.L. and D.L. were not youths in need of care?

## FACTUAL BACKGROUND

¶5 Nancy and John were married in 1989 in Tennessee. In 1995, John, Nancy, and their two children, J.L., born on January 15, 1991, and D.L., born on November 19, 1992, moved to Montana. John testified that prior to their move to Montana and during the time they lived in Montana Nancy suffered recurring symptoms of a mental illness which had been diagnosed prior to their marriage. After moving to Montana, John began counseling with Chris Tremain, a licensed counselor, in order to better deal with his wife's behavior.

¶6 John testified that in the months leading up to Nancy's death she withdrew from the family, was drinking more often, and began to carry a gun. John and several witnesses, including their real estate agent, Ward Jones, J.L's speech counselor, Scott Stansberry, J. L's kindergarten teacher, Betty Anderson, and D.L.'s preschool teacher, Debbie Krummann, testified that they witnessed Nancy exhibit bizarre or irrational behavior during the time she lived in Montana.

¶7 Debbie Krummann testified that during a parent-teacher conference Nancy insinuated that Krummann had conducted a satanic ritual with the preschool children. Ward Jones testified that Nancy was irrational in the way that she dealt with people. Scott Stansberry testified that after spending several hours with Nancy he was so bothered and emotionally affected by the experience, he had to seek counsel with his father so that he could discuss the incident and better deal with it. Betty Anderson testified that in 28 years of teaching and dealing with parents, Nancy was the only parent she had ever hung up the phone on.

¶8 John testified that on the evening of May 2, 1997, he and Nancy had an argument during which Nancy pulled out her gun and threatened to kill herself and John. According to John, Nancy put the gun to her head and pulled the trigger. John testified that she was still alive and that he attempted to retrieve the gun from her. During the ensuing struggle, John testified that he accidently pulled the trigger and the gun discharged a second time into Nancy's head. According to John, Nancy died a short time later. John further testified that following the two gunshots, his daughter D.L. woke up and began to cry in her bedroom. John stated that he covered Nancy's body with their bedding and entered D.L's bedroom; he then took D.L to her brother J.L's bedroom where he was sleeping, and then stayed with D.L. for approximately 15 minutes while she went back to sleep.

¶9 According to John, by the time D.L. was back asleep, he felt that too much time had passed and the police would not understand his delay in calling 911. Additionally, he

testified that he did not want to traumatize J.L. and D.L. by subjecting them to the police's removal of Nancy's body and his possible arrest. Instead of calling 911, John moved Nancy's body to the basement. In the early morning hours he put his sleeping children in his truck, placed Nancy's body in the back and drove to Big Sandy where he buried her body in a shallow grave. Several months later, John exhumed Nancy's body and returned to his residence where he cremated her body and then scattered her ashes in a nearby stream.

¶10 Between the night of Nancy's death on May 2, 1997, until July 4, 1998, John told all interested persons, including J.L and D.L., Nancy's family, and the police, that on May 2, 1997, Nancy packed all of her belongings and left with another man in the middle of the night. However, on July 4, 1998, John confessed to the police that he had lied to them previously. He ultimately gave several statements regarding his involvement in the events which led to Nancy's death and his actions subsequent to her death.

¶11 Because John had no family or friends in Montana who could care for J.L. and D.L., following his arrest on July 4, 1998, DPHHS assumed protective custody of J.L. and D.L. and placed them in foster care. DPHHS then filed a petition requesting a TIA. John stipulated to granting DPHHS a 90-day TIA. However, John reserved his right to withdraw his consent at any time. The District Court also appointed guardians ad litem for J.L. and D.L.

¶12 On October 21, 1998, upon conclusion of its 90-day TIA, DPHHS petitioned for TLC of J.L. and D.L. The District Court scheduled November 12, 1998 as the date for the hearing to consider the petition for TLC. However, on November 10, 1998, John and DPHHS entered into a second stipulation, which granted DPHHS TLC of J.L and D.L. for a period of 180 days. John again reserved the right to withdraw his consent to DPHHS's involvement and to request the District Court to hear the matter prior to the expiration of the 180 days.

¶13 In the meantime, pursuant to a plea agreement, John pled guilty to the offenses of negligent homicide, perjury, and two counts of tampering with or fabricating evidence. On January 4, 1999, the District Court sentenced John to a combined total of 30 years in prison, with 15 years suspended.

¶14 On January 11, 1999, John filed a motion for the District Court to determine custody of J.L. and D.L. On January 12, 1999, John's parents, John, Sr. (Jack) and Marion, filed a

petition for custody of J.L. and D.L. On January 27, 1999, John filed a motion with the District Court requesting that the District Court terminate DPHHS's TIA based on the execution of an agreement between John, Jack, and Marion granting temporary custody of J.L. and D.L. to their grandparents, Jack and Marion. On February 11, 1999, Nancy's sister, Martha Meador Smith, and Nancy's cousins, Carolyn and Terry Goerger, filed a motion to intervene in the action, and the Goergers petitioned the District Court to consider placing custody of J.L. and D.L. with them.

¶15 The District Court held a hearing on March 22, 1999, to consider DPHHS's petition for TLC, John's motion to dismiss DPHHS's TIA pursuant to the second stipulation, Jack's and Marion's petition for custody of J.L. and D.L., and the Goergers' petition for custody of J.L. and D.L. At the hearing, DPHHS argued that J.L. and D.L. were youths in need of care pursuant to § 41-3-403, MCA, and urged the District Court to grant TLC to DPHHS which would then determine the proper placement for J.L. and D.L. John and his parents argued that J.L. and D.L. were not youths in need of care, and that John's agreement to place custody with Jack and Marion eliminated any need for involvement by DPHHS.

¶16 On June 18, 1999, prior to the District Court's decision regarding the issues presented at the March 22, 1999 hearing, DPHHS filed a petition for permanent legal custody and termination of John's parental rights. On June 30, 1999, the District Court entered its order in which it granted John's motion to terminate DPHHS's TLC and pursuant to the custody agreement entered into by John, Jack, and Marion, retained jurisdiction over the parties, and ordered that J.L. and D.L. be placed with Jack and Marion. DPHHS now appeals the District Court's order.

## STANDARD OF REVIEW

¶17 We review a district court's determination of whether a youth is abused or neglected for an abuse of discretion. *See In re the Matter of D.H. and F.H.* (1994), 264 Mont. 521, 525, 872 P.2d 803, 806. "Discretionary judgments made by the trial court are presumed to be correct and will not be disturbed by this Court absent an abuse of discretion by the lower court." *In re the Matter of D.H. and F.H.*, 264 Mont. at 525, 872 P.2d at 806.

## DISCUSSION

## ISSUE 1

¶18 Did the District Court abuse its discretion when it concluded that J.L. and D.L. were not youths in need of care?

¶19 DPHHS asserts that the District Court abused its discretion when it determined that J.L. and D.L. were not youths in need of care. DPHHS contends that the evidence establishes that J.L. and D.L. were youths in need of care, because John's involvement in the circumstances surrounding Nancy's death and his explanation to his children that their mother had abandoned them, constituted emotional abuse of the children. DPHHS alleges that testimony from psychologist, Donna Veraldi, that both J.L. and D.L. were suffering from posttraumatic stress disorder, clearly established that John's actions caused J.L. and D.L. to suffer injury to their emotional well-being and, therefore, the District Court should have concluded that they were youths in need of care.

¶20 In response, John contends that it was not sufficient to merely show that J.L. and D.L. suffer from emotional injury. John asserts that DPHHS must prove that J.L.'s and D.L.'s emotional injuries were a direct result of John's actions or inactions and that such emotional injury amounted to "emotional abuse" as defined by § 41-3-102(8), MCA (1997). John argues that because DPHHS was unable to prove that the emotional injury to J.L. and D.L. was the direct result of his actions or inactions the District Court correctly concluded that J.L. and D.L. were not emotionally abused by John and, therefore, not youths in need of care.

¶21 It is the policy of the State of Montana to preserve the unity and welfare of the family whenever possible. *See* § 41-3-101(1)(d), MCA (1997). It is also the policy of the State of Montana to provide for the protection of children whose health and welfare are or may be adversely affected and further threatened by the conduct of those responsible for their care and protection. *See* § 41-3-101(2)(b), MCA (1997). Moreover, it is the policy of this State to ensure that all youth are afforded an adequate physical and emotional environment to promote normal development. *See* § 41-3-101(1)(a), MCA (1997).

¶22 Section 41-3-102(22), MCA (1997), defines a "youth in need of care" as "a youth who is abused or neglected." Section 41-3-102(2), MCA (1997), defines "abused or neglected" as "the state or condition of a child who has suffered child abuse or neglect." Section 41-3-102(6)(a), MCA (1997), defines "child abuse or neglect" as "harm to a child's health or welfare" or "threatened harm to a child's health or welfare." Section 41-3-102(6)(b), MCA (1997), states that the term "child abuse or neglect" "includes harm or threatened harm to the child's health or welfare by the acts or omissions of a person responsible for the child's

welfare." Section 41-3-102(9), MCA (1997), defines "harm to a child's health or welfare" as including "harm that occurs whenever the parent . . . inflicts or allows to be inflicted upon the child physical or emotional abuse." Section 41-3-102(8), MCA (1997), defines "emotional abuse" as "injury to the emotional well-being or intellectual or psychological capacity of a child, as evidenced by an identifiable and substantial impairment of a child's physical, mental, or emotional ability to function." Accordingly, the question before the District Court was whether J.L. and D.L. suffered injury to their emotional well-being through John's acts or omissions, as evidenced by an identifiable and substantial impairment of J.L.'s and D.L.'s physical, mental, or emotional ability to function.

¶23 The District Court concluded as follows:

> The evidence is clear and convincing [that J.L. and D.L.] . . . are no longer youths in need of care . . . .
>
> . . . .
>
> . . . In essence, Dr. Veraldi believes the children suffered severe emotional abuse while in the custody of their father after their mother's death and the children now suffer from post traumatic stress disorder. Dr. Veraldi believes the children will require long-term therapy and her recommendations were that the children have a stable, supportive home environment, participate in long-term therapy, have contact with their father and be re-evaluated as requested. . . . Dr. Veraldi did not recommend termination of the father's parental rights or that he not be allowed to have contact with his children.
>
> Of interest to the Court was Dr. Veraldi's inability to separate the emotional trauma to the children experienced prior to their mother's death from the emotional trauma caused by their father's dishonesty with the children after their mother's death. The Department, in its extensive Report to The Court, had little time to discuss the mother's mental condition just prior to her death. It is the Court's recollection a representative of the Department sat through the sentencing hearing and heard the testimony of Debbie Krummann, Betty Anderson and Scott Stansberry. These individuals were unbiased objective individuals from the community who had an opportunity to deal first hand with the mother within the weeks before her death. The day care teacher was accused of participating in satanic rituals with the . . . children. A school teacher testified that in 30 plus years of teaching, . . . [Nancy]

was the only parent she ever hung up on. After several hours with the children's mother, a speech therapist had to seek counsel with his father after being completely drained emotionally from the experience. Moreover, the father sought counseling from professionals in his attempt to deal with his wife's serious mental disorder. . . . The Court has carefully reviewed the Psychological Evaluation completed on the children's mother dated October 16, 1987 and notes that the same symptomatology that was evident in 1987 was evident just prior to her death . . . .Thus, these children were subjected to emotional trauma even before the loss of their mother.

¶24 As the basis for its determination that J.L. and D.L. were not youths in need of care, the District Court considered the testimony given by several witnesses at the adjudicatory hearing in addition to the testimony of several witnesses who testified at John's sentencing hearing. Our review of the record discloses that those witnesses speculated about several different causes for the emotional injuries suffered by J.L. and D.L. The different causes discussed included Nancy's mental illness, the tragic loss of J.L.'s and D.L.'s mother, John's explanation to them that Nancy had abandoned them and his failure to tell them the truth about her death for over a year, the children's separation from their father by DPHHS, and John's failure to provide his children with counseling. While different witnesses testified regarding what they believed to be the cause of J.L.'s and D.L.'s emotional injuries, no witness was able to testify with certainty that John was the cause of the children's emotional injuries.

¶25 At John's sentencing hearing, psychiatrist Dr. Joseph Rich testified as follows:

> Q. Dr. Rich, have you--in listening to the testimony today have--have you been able to form or at least further form your opinion concerning Nancy's well being at the time or concerning around the time of the incident in question?
>
> . . . .
>
> A. With regard to this case there are very few things that Iam going to be able to say for sure, very few things that I will be able to say with reasonable medical certainty, but with regard to Nancy Meador I believe that I can say with certainty, with reasonable medical certainty, that Nancy Meador had a chronic mental disorder of some type, and in particular it was of the type that we call one of the psychotic mental illnesses, meaning that it's one of the types that causes individuals to have

delusions, hallucinations, and that they go through periods of remission when they seem better and then periods of exacerbation where the symptoms emerge again, and examples of those are schizophrenia, delusion disorder, schizo-affective disorder, manic depressive disorder. I can't tell you exactly what diagnosis she had, but I can say with reasonable medical certainty that she had one of those . . . .

¶26 While testifying at his sentencing hearing, John stated:

Q. Do you think that there is more than one victim in the case, John?

A. Oh, yes. I feel the children and I are also a victim of--of Nancy's mental illness over the period of time that we were married and the children growing up.

Q. And you recognize that your actions, although they may have been to protect the children, actually may have harmed them?

A. Yes, I understand that now. I didn't at the time.

¶27 Dr. Veraldi testified as follows:

Q. And, as a result of your speaking with the children, gathering the background information, and doing the testing that you described earlier for the Court, did you come up with any type of a result or a diagnosis as to what their condition was at least on December the 1st when you evaluated them?

A. I believe that D.L. in particular met the diagnostic criteria for post-traumatic stress disorder, and I believe that J.L., while he seemed to be more closed down, also had sufficient symptoms when I really looked at them that that was the best diagnosis to give him, although I did not think his problems were as apparent as D. L.'s.

On cross-examination Dr. Veraldi testified as follows:

Q. So the symptoms that you are seeing in [D.L.] and [J.L.] are similar to symptoms that you would expect to see from a child who has lived in a home where the primary care-giver has been mentally ill?

A. That's very possible. Absolutely.

Q. Okay, and, to back my hypothetical, if you were told that children were experiencing those types of behavior prior to a traumatic event would you be able to determine the consequences of the traumatic event versus the consequences of living in a household that's unstable in that way?

A. Generally not . . . .

¶28 Based on the evidence and testimony relating to Nancy's mental illness and bizarre behavior prior to her death, the District Court concluded that J.L. and D.L. were subjected to substantial emotional injury before the loss of their mother, as a result of living with a mentally ill parent. The District Court further concluded that John's actions or inactions, while they may have contributed to the children's emotional injury, did not cause substantial impairment to the children's emotional ability to function. Accordingly, the District Court concluded that J.L. and D.L. were no longer youths in need of care.

¶29 Based on our review of the evidence and testimony presented to the District Court, we conclude that the District Court did not abuse its discretion when it concluded that DPHHS had not proven by clear and convincing evidence that J.L. and D.L. were youths in need of care.

## ISSUE 2

¶30 Did the District Court have authority to retain jurisdiction after it had concluded that J. L. and D.L. were not youths in need of care?

¶31 DPHHS contends that after concluding that the children were not youths in need of care, the District Court had no authority to retain jurisdiction of the case to require that the grandparents follow through with counseling. DPHHS asserts that § 41-3-404(4)(a), MCA (1997), requires that once a determination is made that youths are not in need of care, the petition must be dismissed. Although this position is inconsistent with DPHHS's prior expressions of concern for the children's well-being and its claim that the children are "in need of care" because of their need for counseling, we limit our discussion to the legal merits of its claim.

¶32 In support of its position, DPHHS relies on *In re M.P.M. and A.R.M.*, 1999 MT 78,

294 Mont. 87, 979 P.2d 988. In *In re M.P.M. and A.R.M.*, we held that once the district court dismissed DPHHS's petition for temporary investigative authority, it did not have the authority to order DPHHS to place custody of the youths with their father, stating:

> When the District Court vacated the orders issued following the filing of the petition for TIA, as required by § 41-3-404(2), MCA, it did not have the authority to order the Department to place the children with their father. Nowhere in the statutory framework is the District Court authorized to grant the Department the authority to place the children with one parent as opposed to the other following dismissal of the petition for TIA.

*In re M.P.M. and A.R.M., ¶ 22.*

¶33 In response, John concedes that the District Court no longer has jurisdiction over the DPHHS action, which ceased upon the District Court's determination that the children were not youths in need of care. John asserts that the District Court properly retained jurisdiction over the children via John, Jack and Marion's petition for custody, and stipulation to the District Court's jurisdiction.

¶34 The Custody Agreement entered into by John, Jack, and Marion contains the following condition:

> The parties acknowledge, understand, and agree that jurisdiction over the parties, the children, and all matters pertaining to this Agreement shall be vested with the Montana Tenth Judicial District Court, in and for the County of Fergus; and that any action to modify or enforce this Agreement must be made by petition or motion to the Montana Tenth Judicial District Court, in and for the County of Fergus.

¶35 The District Court ordered that "jurisdiction over John, Jack and Marion, the children and the J.L. and D.L. Trust shall continue pursuant to the terms of the parties' Custody Agreement . . . ."

¶36 Because the District Court's jurisdiction over the parties in this case was based on the terms of the parties' Custody Agreement made pursuant to their petition for custody, and not based on the action to determine whether the children were youths in need of care, we determine that the District Court did not err when it concluded that it retained jurisdiction pursuant to the Custody Agreement.

¶37 The judgment of the District Court is affirmed.

/S/ TERRY N. TRIEWEILER

We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

/S/ JIM REGNIER

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART

/S/ KARLA M. GRAY