DA 11-0758

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2012 MT 175

IN THE MATTER OF K.H. and K.M.,

Youths in Need of Care.

APPEAL FROM:     District Court of the Eighth Judicial District,
In and For the County of Cascade, Cause Nos. BDN 11-159 and BDN 11-160
Honorable Julie Macek, Presiding Judge

COUNSEL OF RECORD:

For Appellants:

Allen P. Lanning; Lanning, Harris & Conklin, P.C.; Great Falls, Montana

For Appellee:

Wade Zolynski, Chief Appellate Defender; Sarah Chase Rosario, Assistant Appellate Defender; Helena, Montana (Mother K.H.)

Jane Marie Berger; Great Falls, Montana (Father C.M.)

Pat Paul, Attorney at Law; Great Falls, Montana (Father K.S.)

John Parker, Cascade County Attorney; Jennifer Ropp, Deputy County Attorney; Great Falls, Montana

Submitted on Briefs:   May 9, 2012

Decided:   August 14, 2012

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1     Counsel for youths K.H. and K.M. appeals the Eighth Judicial District Court's order dismissing the State's petition to adjudicate the children as youths in need of care. We affirm.

¶2     We address the following issues on appeal:

¶3     *1.     Whether the children have standing to appeal the dismissal of the State's petition for their adjudication as youths in need of care.*

¶4     *2.     Whether the District Court erred in dismissing the State's petition for adjudication of the children as youths in need of care on the ground of insufficient evidence.*

## PROCEDURAL AND FACTUAL BACKGROUND

¶5     On July 29, 2011, the State filed identical Petitions for Emergency Protective Services, Adjudication of Youths in Need of Care, and for Temporary Legal Custody in two causes involving K.H. and K.M., the daughters of Appellee K.H. (Mother). The children were two and five years old, respectively, at the time of the petition.

¶6     The State alleged the youths were abused or neglected or at risk of being abused or neglected. In support of its petition, the State provided an affidavit of Amanda Scott, a child protection specialist. Scott reported that K.H. and K.M.'s infant sibling, Ke.H., sustained head trauma while under the care of Mother's boyfriend, Charles Cadwell, which ultimately lead to Ke.H.'s death. Cadwell reportedly stated he tripped on a toy and fell on Ke.H., causing her injuries. The affidavit also indicated that when K.M. was questioned about a red mark on her neck, she claimed Cadwell had choked her with a

2

belt. Scott noted that photographs taken of the family's residence by the Great Falls Police Department revealed beer cans throughout the home, various coins scattered on Mother's bedroom floor, and piles of clothing, towels and bedding strewn about Mother's and the children's rooms.

¶7 On August 1, 2011, the District Court issued an order granting the Department of Public Health and Human Services (DPHHS) authority to implement emergency protective services and to place the children in temporary out-of-home care. The court scheduled a show cause hearing for the petition for adjudication and temporary legal custody on August 25, 2011. The court appointed separate attorneys for Mother, the children, K.M.'s father C.M. (Father One), and K.H. and Ke.H.'s father K.S. (Father Two). The court also appointed a Guardian ad Litem (GAL).

¶8 On August 23, 2011, counsel for Father Two moved for a continuance of the show cause hearing. The court granted the motion over Mother's objection and reset the hearing for October 19, 2011. On August 31, 2011, the State moved for another continuance and Mother again objected. The court granted the motion and reset the hearing for November 17, 2011.

¶9 One week before the hearing, the State moved the District Court to adopt a supplemental affidavit from Scott. The court granted the State's motion on November 14, 2011. The affidavit discussed findings made by Dr. Susan Day, a clinical psychologist who completed a psychological evaluation of Mother, and recounted Mother's disclosures of her past intimate relationships. Scott described that Mother dated

3

Father One for a year and a half before leaving him when K.M. was six weeks old. Mother began seeing Brian Ally for several months and subsequently moved in with him. Mother reported she believed Ally sexually assaulted K.M., so she left him. Mother stated she attempted to report Ally to the authorities but nothing came of it. Mother later began dating Father Two and was residing with him when she gave birth to K.H. and Ke.H. In August 2010, there was a physical altercation resulting in Father Two being charged with Partner or Family Member Assault (PFMA) against Mother. She left Father Two following the incident. Mother met Cadwell in December 2010, and they moved in together in March 2011. After Ke.H.'s death in July 2011, Mother moved in with her aunt. Father One subsequently joined her there. In early September 2011, Father One was involved in a physical altercation with Mother's brother and was charged with disorderly conduct. Mother distanced herself from Father One and he left her residence following the incident. At the time of the hearing, Mother and Father Two were living together and attempting to reconcile. Father Two informed Scott he wanted to be present for the children.

¶10    The show cause hearing began on November 17, 2011. Ke.H.'s treating physician testified that Cadwell's claim that he tripped and fell on Ke.H. was "completely inconsistent with her CT and retinal hemorrhage findings." The physician also stated the CT scans and a skeletal survey of Ke.H. revealed no evidence of any prior fractures or previous abuse.

4

¶11 Great Falls Police Detective Keith Perkins conducted an investigation of the injuries to Ke.H. He testified that Cadwell initially stated he fell on Ke.H., but later, "he described picking up [Ke.H.] and shaking her to the point where he demonstrated that her head struck her back between her shoulders and then her chin struck her chest in front of her." Cadwell ultimately was arrested and charged with deliberate homicide. Perkins also performed a follow-up investigation of K.M.'s claim that Cadwell had choked her with a belt, but did not find K.M.'s allegations credible and did not charge Cadwell based on that accusation. Perkins recounted a discussion he had with Mother about an earlier event in which Father Two interjected in an argument and physical altercation between K.M. and K.H. and struck K.M., leaving a red mark on her chest. Mother stated she went to live with her mother after the incident.

¶12 Three months before Ke.H.'s death, Cadwell arranged for Ke.H. to stay home with him while the two older girls were taken to daycare. Later that morning, Cadwell contacted Mother and asked if she knew why Ke.H. would have bruising on her buttocks. Mother asked him if he was responsible for the bruising, which Cadwell denied. Mother suspected the daycare had caused the bruising. On the advice of friends and family, Mother changed daycares.

¶13 Testimony of the Mother's two daycare providers revealed that both witnessed the girls' bond with Cadwell, and neither had observed anything other than a positive relationship between the children and him. The providers expressed shock that Cadwell

had abused Ke.H. as they had not seen any earlier signs of abuse. Both testified that the children were always well groomed and healthy when they arrived each day.

¶14 Dr. Day, the State's expert witness, testified that Mother should be with her children as much as she wanted. Dr. Day advised that Mother was currently receiving individual therapy and should continue to do so for at least nine months. Dr. Day stated the sessions would benefit Mother and her children, because Mother could use aid in how to better identify suitable partners.

¶15 The GAL submitted her report to the court and advised that Mother had made great progress through her therapy sessions and was very proactive with the recommendations she had been given. The GAL testified the girls love their mother very much and concluded by stating, "As long as this family voluntarily goes through counseling . . ., receives whatever services are required—I have no reason to believe they won't do that—the children should go back into the home."

¶16 At the conclusion of the hearing, the court asked for the position of each of the parties. Counsel for the children stated the following:

> My position is based, Your Honor, on my duty to advocate for my clients. . . . I know what they want, and what they want is to be with their mom. Now, I've heard in several of these cases that that means that I must do whatever is in my power to make sure that, where those are my client's wants, that they are put back immediately. I disagree. My job is to get them what they want in the safest way possible, in the way that serves my clients best. And, therefore, I'm not going to say dismiss this, there's not cause for adjudication. . . . I don't think that's my duty. If I think that there is a reasonable case for adjudication, then I have to argue it.

¶17 The court ruled from the bench that the State had not proven the children were in danger of being abused or neglected. The court followed with a written order in which it determined that, although the evidence was sufficient to support the Department's initial involvement with the family and the State's original petition, there was insufficient evidence to find, by a preponderance of the evidence, that the children were abused or neglected or in danger of being abused or neglected. The District Court accordingly dismissed the petition for adjudication of the children as youths in need of care. The State took no further action. The children's attorney appeals on their behalf.

## STANDARD OF REVIEW

¶18 The parties dispute the standard of review applicable to the District Court's decision not to adjudicate the children as youths in need of care. Counsel for the children argues that, in abuse and neglect cases, findings of fact are reviewed under the clearly erroneous standard and conclusions of law are reviewed for correctness. Citing *In re J.W.C.*, 2011 MT 312, ¶ 15, 363 Mont. 85, 265 P.3d 1265, he suggests the District Court's application of the law to the facts of this case "is a legal conclusion which we review to determine 'whether the interpretation of the law is correct.'" Mother asserts we should review for an abuse of discretion because the evidentiary standard for adjudication of youths in need of care is lower than in proceedings for the termination of parental rights. Sections 41-3-422(5)(a)(ii), 41-3-437(2), MCA (adjudication requires a determination by a preponderance of the evidence that the child is a youth in need of care); §§ 41-3-422(5)(a)(iv), 41-3-609(1), MCA (termination of a parental relationship

7

requires clear and convincing evidence that the statutory criteria have been met). Mother contends this is an issue of first impression because this Court has not yet stated the standard for the denial of a petition to adjudicate, and suggests the standard of review should be more deferential than that applied to a termination of rights decision.

¶19 We have indicated the standard of review for youth in need of care and termination proceedings is the same. *In re J.A.B.*, 1999 MT 173, ¶ 16, 295 Mont. 227, 983 P.2d 387. We review a district court's termination of parental rights for abuse of discretion. *In re J.W.C.*, ¶ 15. We also review for abuse of discretion a district court's determination that a child is abused or neglected. *In re D.H.*, 264 Mont. 521, 524-26, 872 P.2d 803, 805-06 (1994). We have applied the same standard to a district court's ruling that a child is not a youth in need of care. *In re J.L.*, 2000 MT 289, ¶ 17, 302 Mont. 254, 14 P.3d 473. The standard of review does not depend on whether the district court grants or denies a petition to adjudicate a youth in need of care. We have explained the applicable standard as follows:

> We review a district court's decision to terminate parental rights to determine whether the court abused its discretion. We review a district court's specific findings to determine whether they are clearly erroneous. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon reviewing the record, this Court is left with the definite and firm conviction that the district court made a mistake. In reviewing a district court's conclusions of law, we determine if they are correct.

*In re E.K.*, 2001 MT 279, ¶ 31, 307 Mont. 328, 37 P.3d 690 (citations omitted). We apply that standard here and will review the District Court's findings of fact for clear error, its conclusions of law for correctness, and the court's ultimate decision regarding

8

adjudication for abuse of discretion. "A court abuses discretion when it acts arbitrarily, without employment of conscientious judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re A.J.W.*, 2010 MT 42, ¶ 12, 355 Mont. 264, 227 P.3d 1012 (citing *In re C.J.K.*, 2005 MT 67, ¶ 13, 326 Mont. 289, 109 P.3d 232. This Court does not substitute its judgment for that of the trial court regarding the credibility or weight to be given to the evidence, nor does this Court review the record to determine whether evidence would support a different finding. *In re I.B.*, 2011 MT 82, ¶ 36, 360 Mont. 132, 255 P.3d 56; *In re K.J.B.*, 2007 MT 216, ¶ 23, 339 Mont. 28, 168 P.3d 629.

## DISCUSSION

¶20    *1. Whether the children have standing to appeal the dismissal of the State's petition for their adjudication as youths in need of care.*

¶21    As a preliminary matter, Mother argues this appeal should be dismissed because the remedy sought by the children cannot be granted. Mother cites § 41-3-113(3), MCA, (2009),[1] which governs appeals in child abuse and neglect cases. That statute states:

> If the appeal results in the reversal of the order appealed, the legal status of the child reverts to the child's legal status before the entry of the order that was appealed. The child's prior legal status remains in effect until further order of the district court unless the supreme court orders otherwise.

¶22    Mother argues that the statute does not grant to this Court authority to reverse the District Court and require it to adjudicate the youths in need of care upon request of counsel for the children. Mother reasons that, because the court dismissed the

---

[1] Because this proceeding occurred prior to the October 1, 2011, effective date of amendments to the law, all references to the Montana Code Annotated are to the 2009 version, unless otherwise indicated.

proceedings without granting the State temporary legal custody or adjudicating the children as youths in need of care, the children's legal status can only revert to Mother's custody. We disagree. In its August 1, 2011 order, the District Court granted emergency protective services with respect to the youths. Pursuant to this determination, DPHHS placed the girls with their great aunt where they remained until the adjudicatory hearing. Reversal by this Court would return the children to the protective custody of DPHHS and not to Mother. Moreover, Mother's argument ignores the second sentence of the statute, under which this Court could directly alter the child's legal status or order the district court to do so. The circumstances of this case do not foreclose this Court's ability to afford the children a meaningful remedy.

¶23 Mother also argues that the children lack standing. Standing pertains to justiciability and "is a threshold requirement in every case which we must address and decide *sua sponte* even if it is not raised by a litigant." *Dick Anderson Constr., Inc. v. Monroe Constr. Co., LLC*, 2009 MT 416, ¶ 46, 353 Mont. 534, 221 P.3d 675.

¶24 Mother first contends that the children are the subject matter of, and not parties to, this civil action. She relies on § 41-3-422(9)(a), MCA, which provides in pertinent part:

> Any person interested in any cause under this chapter has the right to appear. Any foster parent, preadoptive parent, or relative caring for the child must be given legal notice by the attorney filing the petition of all judicial hearings for the child and has the right to be heard. The right to appear or to be heard does not make that person a party to the action.

10

Mother states that because children are not listed in the statute, they cannot be considered parties. She further points out that even if children were encompassed by the subsection, the statute does not grant party status to those it affords "a right to appear or to be heard."

¶25 We disagree that the statute defeats the children's standing. The subsection cited by Mother does not provide that the children are nonparties. Rather, it identifies persons who are not parties to the proceeding but have a legally cognizable interest and are entitled to be heard. It does not include the children in the list of such non-parties. Section 41-3-425, MCA, on the other hand, does include the children—along with the parents—among those who may be entitled to court-appointed legal representation in the case, a status reserved for parties whose legal interests are directly at stake in the proceedings. Further, § 41-3-101(1)(d), MCA, expresses the policy of Montana law to "recognize that a child is entitled to assert the child's constitutional rights[.]" We cannot square the legislature's directives protecting the interests and rights of children with Mother's contention that they are not permitted a voice in these proceedings.

¶26 Second, Mother asserts that an appeal on behalf of the children may be brought only by the GAL, who is tasked with pursuing the children's best interests. Section 41-3-112(3), MCA. She asserts that if counsel wished to advance what was best for his clients, as he claimed during the hearing, the proper procedure would have been to seek removal of the GAL pursuant to § 41-3-112(5), MCA. Mother states that counsel's only role, as the children's attorney, was to advocate for their personal interests. She claims he failed to do so when, acknowledging that K.M. and K.H. wished to return to their mother, he

11

nonetheless advocated for their adjudication as youths in need of care. We do not accept Mother's argument.

¶27 In *Jacobsen v. Thomas*, 2004 MT 273, 323 Mont. 183, 100 P.3d 106, we addressed § 40-4-205, MCA, which provided that a GAL "may" be an attorney. In that case, we recognized that the attorney for the children has a distinct role from that of the GAL:

> We hold that when a court appoints a guardian ad litem under § 40-4-205, MCA, unless the court specifically indicates it intends the guardian to act as an attorney representing the child, the guardian is not to act as an attorney. Instead, the guardian is required to fulfill the statutory role to objectively aid the court in its decisions regarding the best interests of the child.

*Jacobsen*, ¶ 32. The court's order appointing the GAL here did not state she was to act as an attorney for the children; thus, counsel and the GAL did not have identical roles.

¶28 Section 41-3-425(2)(b), MCA, requires a district court to appoint representation for the children after the State has filed a petition alleging abuse or neglect: "the court shall immediately appoint or have counsel assigned for: . . . any child or youth involved in a proceeding under a petition filed pursuant to 41-3-422[.]" Under the 2011 amendments to the statute, not at issue here, a district court is required to appoint an attorney for the children only if a GAL is not appointed. With the revision, a court now has discretion to appoint counsel for the children in addition to a GAL. Applying the statute in effect at the time, the District Court appointed counsel to represent the children and also selected a GAL. Whether counsel was required or—under the statute as

12

revised—appointed in the court's discretion, we conclude that the attorney has standing to appeal on behalf of his clients.

¶29 We find Mother's argument that counsel failed to advocate for the children's personal interests unpersuasive. In *In re Marriage of Rolfe*, 216 Mont. 39, 699 P.2d 79 (1985), we addressed the unique position of an attorney appointed to advocate for a child when competing interests are in play. Although we specifically limited our holding in that case to court-appointed representation in a custody dispute, our analysis is instructive here. We held that, while an attorney has a responsibility to pursue the lawful objectives of his client, this duty may be affected when "a client's ability to make adequately considered decisions in connection with the representation is impaired . . . because of minority[.]" *Rolfe*, 216 Mont. at 43, 699 P.2d at 81 (quoting M. R. Pro. Conduct 1.14); *see also* M. R. Pro. Conduct 1.2(a). In fashioning the appropriate standard of representation for an attorney in the situation presented in *Rolfe*, we explained that both the child's best interests and the client's personal interests must be considered:

> We recognize that in Montana the attorney for the child is not a guardian ad litem. Nevertheless his role in a custody dispute is to advocate the child's best interest, not the child's wishes. This is a difficult role, particularly when the child's expressed wishes conflict with the attorney's determination of his best interests. But, given the immaturity of the client and the pressures that often exist in a divorce situation, it is the Court's opinion that *the best interests of the child, the paramount concern in all custody disputes, is best served by modifying that traditional lawyer-client relationship*.

*Rolfe*, 216 Mont. at 43, 699 P.2d at 81 (emphasis added). Emphasizing "that a child's wishes deserve serious consideration," we determined that counsel for the child must

13

disclose to the court any express wishes of the child that counsel concludes are not in the child's best interests. "Th[e] district court must be clearly informed of the child's wishes and the basis for that attorney's determination that it is not in the child's best interest to live with the preferred parent." *Rolfe*, 216 Mont. at 43, 699 P.2d at 81.

¶30 Here, as in *Rolfe*, counsel was faced with a situation in which his clients expressed their personal wishes, but he reasonably believed advocating for that position would not benefit the young children's best interests. Counsel disclosed his clients' desires to the court and then explained why he could not properly execute his responsibilities as counsel by arguing that they be immediately returned to their Mother's care. The record demonstrates that counsel considered the children's expressed objective and advocated for it through a process that would serve their best interests. Counsel acknowledged that K.M. and K.H. should ultimately be reunited with Mother, but argued that adjudication of the children as youths in need of care was necessary to ensure Mother received appropriate treatment so that she could protect her children.

¶31 We hold that K.M. and K.H. have standing to appeal the District Court's order of dismissal and that their attorney acted within his representative capacity by advocating for their adjudication as youths in need of care despite the children's expressed desire to return to Mother's custody.

¶32    *2.    Whether the District Court erred in dismissing the State's petition for adjudication of the children as youths in need of care on the ground of insufficient evidence.*

¶33    A court "may" adjudicate a child to be a youth in need of care if the State proves, by a preponderance of the evidence, that the child has been abused or neglected. Sections 41-3-437(2), -102(34), MCA. "Child abuse or neglect" is defined as actual physical or psychological harm to a child, substantial risk of physical or psychological harm to a child, or abandonment. Section 41-3-102(7), MCA. "Physical or psychological harm" occurs when a parent "exposes or allows the child to be exposed to an unreasonable risk to the child's health or welfare by failing to intervene or eliminate the risk." Section 41-3-102(21)(a)(v), MCA.

¶34    The children assert that the District Court should have determined that the State met its burden of proof. Counsel points out that Mother has a demonstrated history of poor judgment in choosing romantic partners, she returned to Father Two after witnessing him strike K.M. during an altercation between the children, she remained with Cadwell after discovering the bruising on Ke.H.'s buttocks, and she failed to report any of the previous instances to the police or Child Protective Services.

¶35    During the State's summation at the hearing, the Deputy County Attorney began to underscore Mother's pattern of choosing partners not conducive to her health. The court, however, interjected and noted that Mother's personal relationship choices should have no bearing on the adjudication proceedings unless those decisions directly affect the children:

15

Well, let me stop. We can't—I can't adjudicate someone as not being a fit parent because they don't make good choices for themselves, all right? So this idea that she has to make choices for partners that are satisfactory to the Court, if it doesn't involve the children, is none of our business, frankly, so to the extent that that's an issue here it shouldn't be.

¶36 The children argue that this distinction was not supported by Montana law based on our decision in *In re G.S.*, 2002 MT 245, 312 Mont. 108, 59 P.3d 1063. In that case, the children witnessed their father commit acts of violence against their mother and were subject to physical abuse themselves. *G.S.*, ¶ 9. Although the father was incarcerated at the time of the hearing, we upheld the district court's order granting DPHHS temporary legal custody, in part, because the mother "demonstrated an inability to protect the children from physical abuse or the psychological and emotional effects of living in an abusive home." *G.S.*, ¶ 44.

¶37 The children also cite to the following language in *In re S.M.*, 2001 MT 11, ¶ 51, 304 Mont. 102, 19 P.3d 213:

Michelle argues that she poses no harm to her children and that the men previously in her life, Michael and Gerald, cannot now be used to deny her her parental rights. However, as we noted previously, we do not have a crystal ball to look into, so our determination of a person's ability to parent their child must, to some extent, be based on that person's past conduct. It is precisely because of the men Michelle previously let into her life and the children's lives that DPHHS is concerned that Michelle is incapable of keeping her children safe from future harm that could be inflicted upon them by third parties.

¶38 Our precedent instructs a district court to look to a parent's past conduct to inform the exercise of its discretion in abuse and neglect proceedings. In both *G.S.* and *S.M.*, the mother's prior relationships themselves did not lead us to affirm the adjudication of the

16

children as youths in need of care. In *G.S.*, we focused on several other factors. For example, we stated, "[s]ignificantly, the children were present during nearly every one of the domestic violence incidents" and were repeatedly subject to abuse themselves. *G.S.*, ¶¶ 13-14. The mother posed a "flight risk" as she was just "passing through Montana," had a history of "leaving the jurisdiction," and she "had no family support nearby." *G.S.*, ¶¶ 14, 16. The social worker assigned to the case testified, "it was not in the children's best interest to remain with [the mother] because of the children's fear that when they are with their mother, [their father] will return and abuse her again." *G.S.*, ¶ 15. The social worker noted that the mother was not being forthright with him as she would "change her story within minutes of giving a different story" and claimed "there was absolutely no history of abuse." *G.S.*, ¶ 13. Likewise, in *S.M.*, the district court determined that, "although [the mother] attempted compliance with her treatment plans, those attempts did not successfully rehabilitate her to obtaining minimum parenting skills." *S.M.*, ¶ 43. We noted the mother's failure to attend family therapy and the testimony of the mother's therapist that she "had demonstrated that she was incapable of safely supervising more than one child at a time." *S.M.*, ¶¶ 45, 47. We also expressed concern that the mother continued to live with her boyfriend once she was confronted with his physical and sexual abuse of her child. *S.M.*, ¶ 48. Even after the children had been removed from her care, the mother brought the children's abuser with her to a DPHHS scheduled visit with them. *S.M.*, ¶ 49.

¶39 Here, unlike in *G.S.* and *S.M.*, there was substantial evidence before the District Court demonstrating that Mother immediately removed her children from environments that were unsafe for them, remained accountable for her actions, was completely cooperative with law enforcement, took proactive steps to protect her children, and continued to abide by the recommendations of her treatment providers. The District Court did not commit an err of law in concluding that Mother's past conduct, including her choice of intimate partners, should be judged by how that conduct affects the children.

¶40 Both Detective Perkins and Detective Noah Scott described Mother as shocked when they informed her that Cadwell was responsible for causing Ke.H.'s injuries, and both stated that she expressed no sympathy for him. They noted Mother did not appear to be concealing anything and was cooperative throughout the investigation. Perkins stated that Mother provided detailed accounts of all the information he sought and offered her phone to the officers because it contained photographs of the bruising on Ke.H.'s buttocks.

¶41 Amanda Scott testified that Mother had not had any concerns about Cadwell before Ke.H.'s death. Scott had never received a report that Cadwell or Mother had abused or neglected the children, nor had she received any reports of alcohol or drug abuse by either parent. Scott also acknowledged she had not received any notifications from the children's daycare providers, who are under a legal obligation to report any indications of abuse or neglect.

¶42 Dr. Day, who evaluated Mother, acknowledged during the hearing that Mother exhibited some defensiveness during her evaluation, but testified that was common in these settings where people "feel scrutinized" and "there's a lot at stake." Day elaborated that "in this situation I felt that [Mother] revealed quite a bit about her history that was not favorable. I felt like she—you know, she gave it a fair shot, to tell me what was going on with her, so I didn't make over-interpretations about the defensiveness." Day would not say that Mother currently lacked the capacity to protect her children. She further stated, "I don't have any evidence to suggest that she cannot have access to her children. In fact, it's probably in all of their best interests that she have as much contact as she would like at this point." Day's prognosis for Mother was "guarded," and she concluded by recommending that Mother continue participating in individual therapy for at least nine months and avoid relationships with people with substance abuse problems, criminal histories, or who are under child and family services supervision.

¶43 Mother testified that Father Two had been cited for PFMA against her but the children were not present during that incident. She stated she had no concerns when she left her children with Cadwell because they bonded with him and did not appear to be fearful of him. When asked about her reaction when she was notified that Cadwell had caused Ke.H.'s head trauma, Mother's response was, "I could not believe that he could hurt her, and I was mad, I—I fell apart." Mother stated she was currently engaged in counseling and would continue to do so even if the abuse and neglect proceedings were dismissed.

¶44 The GAL stated at the hearing that she spoke with both the counselor for the children and the counselor for Mother and received positive feedback. In regard to Mother, the GAL stated:

> [Mother] has made great progress, she's very proactive, I've seen that myself. Nothing stops her. If there's a recommendation made she immediately acts on that. The girls very much love her. I've witnessed those, you know, encounters, and what I see is that the girls are upset when they're separated from their mother . . .

The GAL made the following recommendation: "As long as the family voluntarily goes through counseling, . . . [and] receives whatever services are required, . . . the children should go back into the home."

¶45 After hearing all the testimony and the parties' closing statements, the District Court made extensive oral findings, considering and analyzing all the evidence. The court noted the red mark located on K.M.'s neck, but observed that law enforcement officers did not find K.M.'s allegation that Cadwell choked her sufficiently credible to warrant additional criminal charges. The court discussed the state of Mother's home when law enforcement entered and determined that laundry, coins, and beer cans lying around are not uncommon in other households and would not give rise to a youth in need of care proceeding but for the circumstances leading to the investigation. As to the bruising on Ke.H.'s buttocks, the court pointed out it was unknown whether Cadwell or Ke.H.'s daycare provider was responsible for the injury. The court concluded that, based on the information Mother had at the time, she acted properly in response to the incident by changing daycares and advising the new providers to look for any physical marks on

20

her children and to notify her if anything was discovered. Regarding Cadwell's statement that he inflicted the injuries leading to Ke.H.'s death, the District Court found that: "[b]ut for this incident in April all parties agree, all the witnesses agree, that there was no evidence whatsoever for this mother to look at and conclude that Mr. Cadwell was the problem and that she needed to do anything further to protect any of these children from him."

¶46 The court then went on to discuss the mitigating factors weighing in Mother's favor:

> [M]other submitted to the psychological evaluation, was honest with the provider, in regards to her history of life, in regards to her life experiences[.]
>
> . . .
>
> The recurring theme, frankly, of the mother's behavior has been that when, in fact, there has been any incident that has caused her any concern for her children, what she has done is to make a decision to protect the child. She's made the decision to leave the person that was the problem. She's made the decision to have that person leave her. And she has I think not chosen her needs over the child but chosen the children's needs over her own[.]

¶47 The court specifically addressed the fact that Mother had allowed Father Two back in her life, framing the issue as "whether or not that scenario causes this court to be concerned that these children would be in danger of abuse or neglect because of her relationship." The court noted Father Two had no involvement in the underlying allegations of this case, and his interjection in the physical altercation between the children did not form the basis for the original petition.

¶48 In her oral findings, the District Judge stated that, "although there certainly was sufficient reason for this department to take this matter extremely seriously and to evaluate this matter as they did," based upon the record "there is not a preponderance of the evidence to conclude that the children would be in danger of being abused and neglected if the department were not involved in this matter."

Finally, the judge stated:

> [I]t's apparent, this has been a difficult decision for this Court to make because its responsibility is to attempt to look at all matters in regards to the requirements of the law, to not be influenced by sentiment or conjecture or speculation and to look at the actual facts before it to make this decision, and in looking at all of those factors, if I did not believe that these children would not be safe, I wouldn't do it.

¶49 The court's detailed analysis reveals that it addressed and carefully considered every concern the children now raise on appeal. "This Court will not substitute its judgment for that of the District Court's regarding the credibility, persuasiveness, and weight to be given to [the witnesses'] testimony." *I.B.*, ¶ 36 (citing *K.J.B.*, ¶ 23). We also will not consider "whether the evidence could support a different finding." *K.J.B.*, ¶ 23. The record below demonstrates sufficient evidence to support the District Court's determination that K.H. and K.M. were not in substantial risk of physical or psychological harm or abandonment. Section 41-3-102(7), MCA.

## CONCLUSION

¶50 The children had standing to appeal the District Court's refusal to adjudicate the children as youths in need of care and their attorney acted within the parameters of his legal obligations by pursuing their adjudication. The court's factual findings were not

clearly erroneous and its determination that the preponderance of evidence did not establish the children were youths in need of care was not made arbitrarily, without conscientious judgment, or in excess of the bounds of reason. The court's ruling was thoroughly reasoned and finds support from substantial evidence in the record. The District Court's order dismissing the petition is affirmed.

/S/ BETH BAKER

We concur:

/S/ PATRICIA COTTER
/S/ MICHAEL E WHEAT
/S/ JIM RICE

Justice Brian Morris dissents.

¶51    I agree with the Court that counsel for the children possessed standing to prosecute this appeal on behalf of the children. I disagree, however, with the Court's conclusion that the District Court properly evaluated the evidence and Mother's response to perceived threats to her children. The District Court noted that Mother has made the decision to protect the children whenever "there has been any incident that has caused her any concern for her children." The tragic circumstances of this case demonstrate that Mother's 20-20 hindsight greatly exceeds her instincts when it comes to dangers to her children.

¶52    No one disputes that Caldwell shook 17-month-old Ke.H. to the point that she suffered brain injuries from which she never recovered. This incident took place less than one hour after Mother had left Caldwell, her boyfriend of six months, in charge of the care of her three young children. This incident with Caldwell did not represent Mother's first failure to heed warning signs.

¶53    A few months earlier, Caldwell had called Mother at work to inquire why Ke.H. had bruising on her buttocks. Caldwell was home alone with Ke.H. Caldwell denied having caused the bruising. Mother suspected instead that the child's daycare provider had caused the bruising. Mother failed to report the daycare provider to authorities for suspected physical abuse. Mother testified that she failed to report the suspected physical abuse out of fear of being accused of abuse or neglect and having to prove herself innocent. Mother's decision to put her own concerns above the well being of her children denied the Department or law enforcement of the chance to investigate the circumstances under which Mother raised her three young children. This investigation possibly could have prevented the needless and tragic death of Ke.H. at Caldwell's hands a few months later.

¶54    Caldwell represented Mother's fourth adult romantic relationship. Violence against Mother and/or her children or her family marred each of these four relationships. In fact, Mother's relationship with Brian Ally, her second boyfriend, ended after Mother had determined that Ally had sexually abused one of her daughters. Mother failed to report the suspected sexual abuse of her daughter to the Department or the police.

Although not discussed directly in the record, we can assume that Mother once again failed to report suspected sexual abuse of her defenseless daughter out of fear that she might have been forced to undergo an investigation into how she raised her children and whether she provided them with a safe home environment.

¶55 Mother had started her adult relationships a few years earlier under similarly inauspicious circumstances. Mother was 18 when she began dating C.M., the father of her oldest daughter. Mother left Father 1 shortly after her daughter was born due to Father 1's infidelity. Father 1 fathered a child with another woman. Mother nevertheless turned to Father 1 for help following the tragic death of Ke.H. at Caldwell's hands. Father 1 moved back to Great Falls and stayed with Mother and her two surviving daughters. This arrangement soon ended, however, when Father 1 got into a fight with Mother's brother. The fight resulted in Father 1 being charged with disorderly conduct.

¶56 Mother began dating her third boyfriend, Father 2, when she was 21. The stormy relationship produced a series of violent incidents. At one point, Father 2 intervened in an argument between Mother's two older children. Father 2 whacked the older daughter across the chest. The blow left a red mark on the young girl's chest. Mother failed to report this incident, or any of the violent incidents, to law enforcement or other authorities. I once again must assume that Mother placed her own interest, and concerns about outside investigators, above the well being of her children when she failed to report any of the incidents.

¶57 The violence from Father 2 eventually escalated to such a degree, however, that Mother left Great Falls to move in with her mother in a different city. Mother soon reconciled with Father 2 and he moved back in with Mother and her daughters. The short-lived family harmony ended when Mother and Father 2 argued about her alleged lack of faithfulness. Father 2 ended the dispute by backhanding Mother and tackling her. The attack led to Father 2's conviction for partner or family member assault.

¶58 Father 2's criminal sentence included completion of an anger management program and the payment of various fines. Father 2's failure to abide by these conditions resulted in an outstanding warrant for his arrest. The issuance of the warrant seemed like an opportune time for Father 2 to fill the void in Mother's life created by the abrupt departure of Father 1 after Father 1's fight with Mother's brother. Father 2 moved back in with Mother and her two surviving children at that time. Thus, within months of Ke.H.'s death at the hands of Caldwell, Mother invites back into her home, with her two surviving children, two former boyfriends who have a documented history of violence against Mother or her family.

¶59 I agree with the Court that a person's failure to make good relationship choices for themselves, standing on its own, fails to warrant the termination of the person's parental rights. Personal autonomy must give way to the children's best interests, however, when Mother's bad choices continue to place her children with men with histories of violence. Ke.H.'s death by Caldwell forever changes the calculus. The Department now has documented proof that Mother's bad relationship choices have dire, and, tragically, fatal

26

consequences for Mother's children. The home environment provided by Mother, including the adults whom she invites into this home environment, should serve as the focal point of the Department's inquiry regarding the children's best interests.

¶60 The Court attempts to distinguish our decisions in *G.S.* and *S.M.* on the basis that the violence in those two cases had taken place in the presence of the children and the fact that the children occasionally were themselves the victims of violence. ¶¶ 39-40. These attempts fall short of the mark. Mother clearly was the victim of violence by several of her former partners. Mother provides the only testimony that the children might not have witnessed all of these attacks. This same Mother failed, however, to report numerous incidents of domestic violence and Ally's suspected sexual abuse of one her daughters out of fear of being accused of abuse or neglect and having to prove herself innocent. I cannot help but wonder whether Mother considered similar factors when relating the circumstances of the earlier abuse.

¶61 More importantly, the children themselves were the occasional direct victims of the abuse. Mother admitted to having witnessed Father 2 strike her older daughter across the chest. Mother too ignored the fact that Caldwell likely had caused bruising on Ke.H.'s buttocks a few months before Ke.H.'s death. Mother opted instead to attribute the bruising to Ke.H.'s daycare provider. Mother's failure to report her suspicions regarding the daycare provider to authorities raises serious doubts about the strength of Mother's belief in who caused the injuries.

27

¶62 And finally, it is a cliché that unchecked domestic violence escalates over time. Mother failed to check Caldwell's violence against Ke.H. because she "could not believe that [Caldwell] could hurt [Ke.H.]." The time to defer to Mother's beliefs long has passed. I dissent.


/S/ BRIAN MORRIS