Justice Laurie McKinnon delivered the Opinion of the Court.
***269 ¶ 1 G.W.'s mother, S.W. (Mother) appeals from an order of the Eighth Judicial District Court, Cascade County, terminating her parental rights. We affirm and address:
Whether the District Court clearly erred by adjudicating G.W. a Youth in Need of Care.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2 In January 2016, the Department of Public Health and Human Services (Department) petitioned the District Court for Emergency Protective Services (EPS) and Temporary Investigative Authority (TIA)
***270 over G.W., then age four. In its petition and *577 accompanying affidavit, the Department requested TIA because of: (1) allegations G.W.'s father, S.N. (Father) physically and sexually abused G.W.; and (2) allegations Mother psychologically abused G.W. by fabricating allegations against Father and thereby subjecting G.W. to a harmful amount of unwarranted medical interventions.
¶ 3 The affidavit detailed the Department receiving over a dozen reports, beginning when G.W. was seventeen-months-old, alleging Father abused G.W. As a result, Mother had G.W. examined by several healthcare providers and mental-healthcare providers "without any physical evidence of physical or sexual abuse." The affidavit described Deputy Popelka's questioning of G.W.: "I asked [G.W.] what she did today. [G.W.] stated she was at her dad's house, and she slept in his bed until morning, when he carried her back to her bed. She said her vagina hurt, because he hurt it. Then she said, 'Mom, I don't know the rest.' " (Emphasis omitted.) Further, the affidavit noted Father did not have "any unsupervised contact with [G.W.] since [G.W.'s] birth." The District Court granted the Department EPS and later, upon Mother's and Father's stipulations, TIA.
¶ 4 In March 2016, the Department removed G.W. from Mother's care, placing her in therapeutic foster care and allowing Mother and Father visitation. The Department expressed uncertainty about Father's ability to parent G.W. due to his limited contact with G.W. The Department petitioned the District Court to adjudicate G.W. a Youth in Need of Care (YINC) based on concerns Mother psychologically abused G.W. by subjecting her to ongoing, unsubstantiated allegations Father abused her. The District Court scheduled an adjudication hearing. The parties requested the District Court allocate an entire day for the hearing. The District Court scheduled a three-hour hearing and Mother moved for the court to reconsider its allocation, asking for "eight hours or more." In an order on trial administration, the District Court noted, based on its experience, "[m]ost adjudicatory hearings take 15 minutes or less" because they are "limited" in scope, the burden of proof is the preponderance of the evidence, and "extensive factual and expert testimony" is unnecessary. The District Court invited the parties, upon their agreement, to submit expert witness depositions for the court to consider prior to the hearing and maintained the scheduled three hours for the adjudication hearing. The parties agreed and Mother submitted an expert witness deposition of Dr. Brenda Roche for the District Court's consideration.
¶ 5 Dr. Roche did not evaluate G.W. personally, but reviewed G.W.'s medical record and met with Mother twice. In Dr. Roche's deposition, ***271 she questioned the methodology Dr. Michael Bütz, one of the Department's experts, used and opined that G.W. seeing several therapists was not uncommon for a four-year-old. In Dr. Roche's deposition, she also questioned the Department's efforts to prevent G.W.'s removal from Mother's care.
¶ 6 In May 2016, the District Court held G.W.'s adjudicatory hearing. Attorneys for the Department, Mother, and Father appeared in addition to G.W.'s appointed Guardian ad Litem. At the outset, the District Court stated it reviewed Dr. Roche's deposition and, "With that in mind, each party has an hour. I have timers up here, and your cross-examinations will count against your time." Thus, the court determined that the previously allocated amount of time-three hours-would be distributed evenly between the Department, Mother, and Father, with each having one hour to present evidence. Mother did not object to the District Court allocating her one hour, of the three-hour hearing, to present. The Department presented two witnesses, Dr. Bütz and Dr. Patrick Davis. Mother cross-examined both of the Department's witnesses and presented one witness, Dr. Cynthia Brewer. Father did not present any witnesses.
¶ 7 Dr. Bütz testified he performed a psychological examination of G.W. and concluded G.W. was "an average little girl" with "average intellectual ability [and] average adaptive ability," but suffers "delays" because of "distress and regression" caused by multiple presentations to healthcare providers. Dr. Bütz testified:
Well, if we take a look at the records, she's been presented 14 different times for various allegations that have not been proven.
*578 She's been through at least three therapists at the age of four, which is highly uncommon, and seemingly been put forward for false allegations. So we've got a child who's been presented to this system repeatedly, and that is causing her distress and regression.
Dr. Bütz described the physical examinations providers performed on G.W. and the examinations' results. Dr. Bütz explained G.W.'s examinations did not reveal indications of physical or sexual abuse (reading an examination note, " 'Perineum is normal in appearance. Labia majora is normal. The hymen is normal. There are no abrasions, lacerations or cuts, erythema, swelling, or ... abnormalities noted in the labia, perineum or rectal area,' " and commenting, "This is an example of the kind of thing that is seen over and over in the record."). Instead of finding evidence of abuse during the examinations, Dr. Bütz suggested the examinations themselves were abusive. As a result of her repeated presentations to healthcare providers because of Mother's ***272 allegations, Dr. Bütz diagnosed G.W. with "unspecified trauma."
¶ 8 Dr. Davis testified he performed a psychological examination of Mother. Dr. Davis concluded Mother likely suffers from both Factitious Disorder and Factitious Disorder by Proxy. Dr. Davis described the disorder as one in which a person will "fabricate something as a way of getting attention, or as a way of being involved with the medical or the healthcare system" by either fabricating something about themselves (Factitious Disorder ) or another, such as a child (Factitious Disorder by Proxy). Dr. Davis testified there is a variation of the disorder "in which people will fabricate allegations of sexual abuse." In addition to the allegations Mother made against Father concerning G.W., Dr. Davis described an instance in the past, included in Mother's medical record, in which she "fabricat[ed] reports of sexual assault against herself" in Maine and an instance of Mother recently being "under investigation for making a false report" about being sexually assaulted in Montana.
¶ 9 Dr. Brewer testified about her physical examination of G.W.'s pelvic area and noted concerning observations, including that G.W. had a "thin hymen," "two superficial tears," and "redness." Additionally, Dr. Brewer testified G.W. disclosed instances where Father touched her inappropriately and Mother disclosed observing G.W.'s behavior changing negatively after she visited Father. Dr. Brewer testified she did not believe Mother was leading or coaching G.W. to make disclosures.
¶ 10 After the Department and Mother presented witnesses, the record indicates Father had an opportunity to present his own witnesses; however, Father's attorney stated, "No, Your Honor, I don't have any witnesses." Throughout the hearing, the District Court notified Mother and the Department how much time remained by referring to their designated timer. Both Mother and the Department used their allocated time. After the parties presented, the District Court concluded G.W. was "at risk of psychological harm, or has been exposed to psychological harm by [Mother]" and adjudicated G.W. a YINC. Thereafter, Mother asked to present an additional witness available to testify on her behalf, G.W.'s therapist, Rochelle Beley. The District Court did not allow the testimony.
¶ 11 After adjudicating G.W. a YINC, in June 2016, the District Court approved and adopted a treatment plan for Mother and Father. Mother did not comply with and failed to complete her treatment plan and, in December 2017, the District Court terminated Mother's parental relationship with G.W. The Department no longer had concerns about Father's ability to parent G.W. and placed G.W. in his care. Mother ***273 appeals.
STANDARDS OF REVIEW
¶ 12 We review the termination of parental rights for an abuse of discretion considering whether the court acted arbitrarily, without employing conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. In re M.J. , 2013 MT 60, ¶¶ 16-17, 369 Mont. 247, 296 P.3d 1197 (quoting In re K.H ., 2012 MT 175, ¶ 19, 366 Mont. 18, 285 P.3d 474 ). Further, in connection with a court's decision to terminate, we review its findings of fact for clear error and its conclusions of law for correctness.
*579 In re M.J ., ¶ 16 (quoting In re K.H ., ¶ 19 ). A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the court misapprehended the effect of the evidence or if, upon our review of the record, we are convinced the court made a mistake. In re M.J ., ¶ 16 (quoting In re K.H ., ¶ 19 ). A court's finding that a child is a YINC is a finding of fact reviewed for clear error. In re M.J ., ¶ 21.
DISCUSSION
¶ 13 Mother argues the District Court erred by adjudicating G.W. a YINC. Specifically, Mother argues the District Court violated her due process rights by limiting the adjudicatory hearing to three hours when the parties' requested eight hours and then "further restrict[ing] the hearing to two hours without providing a reason for doing so."
¶ 14 A parent's right to the care and custody of a child is a fundamental liberty interest protected by fundamentally fair procedures. In re D.B ., 2007 MT 246, ¶ 17, 339 Mont. 240, 168 P.3d 691. Accordingly, a court must comply with specific guidelines when terminating parental rights. See §§ 41-3-101 to -612, MCA. A court can terminate a person's parental rights if: (1) the child is an adjudicated YINC; (2) an appropriate and approved treatment plan was not complied with or successful; and (3) the conduct or condition rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. A court satisfies the first, adjudication criterion "if the court determines by a preponderance of the evidence ... that the child is a youth in need of care." Section 41-3-437(2), MCA. A YINC is "a youth who has been adjudicated or determined, after a hearing, to be or to have been abused, neglected, or abandoned." Section 41-3-102(34), MCA. "Child abuse or neglect" includes both "actual physical or psychological harm to a child" or "substantial risk of physical or psychological harm to a child." Section 41-3-102(7)(a), MCA. Further, ***274 "Adjudication must determine the nature of the abuse and neglect and establish facts that resulted in state intervention and upon which disposition, case work, court review, and possible termination are based." Section 41-3-437(2), MCA. Read together, these statutes allow a court to adjudicate a child a YINC where it holds a hearing and determines, based on a preponderance of the evidence, the child was psychologically abused or is at a substantial risk of being psychologically abused.
¶ 15 Here, Mother's right to fundamentally fair procedures was protected when the District Court complied with the statutory provisions governing adjudicating a child a YINC and terminating her parental rights. The Department petitioned the District Court to adjudicate G.W. a YINC based on Mother's psychological abuse. The District Court held a hearing and the Department provided evidence Mother fabricated allegations about Father physically and sexually abusing G.W. over a period of years; Mother likely suffered from both Factitious Disorder and Factitious Disorder by Proxy; and Mother presented G.W. to healthcare providers fourteen times and to a minimum of three therapists. The Department also presented evidence G.W. suffered "delays" as a result of Mother's conduct. The District Court allowed Mother, represented by counsel, an opportunity to rebut the Department's evidence by cross-examining the Department's witnesses and presenting, through deposition and live testimony, witnesses of her own. Witnesses testifying on Mother's behalf questioned the Department's experts and described physical manifestations that could have indicated sexual abuse, thereby validating Mother's contentions Father abused G.W. The District Court held a hearing, Mother meaningfully participated in the proceeding, and the District Court relied on sufficient evidence to determine, based on a preponderance of the evidence, Mother psychologically abused G.W. or put G.W. at risk for psychological abuse. Therefore, the District Court complied with the statutory guidelines for adjudicating G.W. a YINC and provided Mother protection by complying with fundamentally fair procedures.
¶ 16 Further, Mother argues the District Court violated her due process rights by allocating less than eight hours for the adjudicatory hearing. Parents have due process *580 rights in abuse and neglect proceedings, including the right to be represented by counsel at adjudicatory hearings and the concomitant right to the effective assistance of counsel. In re A.S ., 2004 MT 62, ¶ 20, 320 Mont. 268, 87 P.3d 408 ; In re J.J.L. , 2010 MT 4, ¶ 17, 355 Mont. 23, 223 P.3d 921. However, as the District Court noted, trial courts also have "broad ***275 discretion" over their own administration, including establishing "a reasonable time limit on the time allowed to present evidence." Fink v. Williams , 2012 MT 304, ¶ 18, 367 Mont. 431, 291 P.3d 1140 (internal quotations and citation omitted). Here, evidence in the record reveals there was a considerable amount of conflict between the parties and the District Court therefore heightened its efforts to efficiently administer the proceeding. The District Court notified the parties, prior to the adjudicatory hearing, that the total time for the hearing would be three hours; notified the parties at the beginning of the hearing that each party had one hour; and, throughout the hearing, reminded each party how much time remained. The transcript reveals the District Court set timers "up here," indicating the parties could visually see the timers and keep track of their own time. The District Court did not abuse its broad discretion to administer the proceeding by scheduling a three-hour adjudicatory hearing.
¶ 17 Mother also argues the District Court "further restricted without warning" the time it scheduled for the hearing from three hours to two hours and deprived her of an additional thirty minutes, or the difference between three hours divided in half and the one hour she received. On appeal, Mother argues the thirty minutes would have allowed her to present Ms. Beley's testimony, testify herself, or both. Mother's argument presumes, inaccurately, that the District Court only allocated time to her and the Department. The transcript reveals Father and Father's attorney were also present in the courtroom, the District Court noted Father's attorney's appearance at the outset of the hearing, gave Father's attorney an opportunity to object to the admission of exhibits, and an opportunity to present witnesses, which he declined. At one point during the adjudicatory hearing, Father's attorney accidentally answered a question the District Court directed at the Department's attorney. In response, the court quipped, "I can charge you with one second for that." This exchange makes clear there were three segments of allocated time, one of which was Father's. Further, Mother did not object when the District Court stated, "each party has an hour" or at any point thereafter explain to the court that she relied on having one hour and thirty minutes of time. Mother did ask to present Ms. Beley's testimony but waited until after she exhausted her time and the District Court determined G.W. was a YINC. We conclude the District Court allocated the Department, Mother, and Father, one hour of time during the three-hour adjudicatory hearing to present evidence G.W. was or was not abused, allowed the parties to submit depositions for its consideration, and provided notice of the parties' time limitations both prior to the hearing ***276 and at the hearing's outset. Based on the record, we disagree with Mother's assumption that the District Court "further restricted" Mother's time at the adjudicatory hearing "without warning."
CONCLUSION
¶ 18 The District Court did not clearly err in adjudicating G.W. a YINC because it afforded the parties adequate due process and sufficient evidence supported its finding G.W. suffered psychological abuse or was at risk of suffering psychological abuse. Affirmed.
We concur:
DIRK M. SANDEFUR, J.
JIM RICE, J.
BETH BAKER, J.
INGRID GUSTAFSON, J.