
DA 10-0421

IN THE SUPREME COURT OF THE STATE OF MONTANA

2011 MT 82

IN THE MATTER OF

I.B.,

    A Youth in Need of Care.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
In and For the County of Ravalli, Cause No. DN 08-11
Honorable James A. Haynes, Presiding Judge

COUNSEL OF RECORD:

    For Appellants:

    Robin A. Meguire, Attorney at Law, Great Falls, Montana

    For Appellee:

    Steve Bullock, Montana Attorney General; C. Mark Fowler, Assistant
Attorney General, Helena, Montana

    Howard Recht, Department of Public Health and Human Services, Hamilton,
Montana

Submitted on Briefs:  March 16, 2011
Decided:  April 20, 2011

Filed:

_____
Clerk

Justice Brian Morris delivered the Opinion of the Court.

¶1     B.K. and C.B., natural mother and father of I.B., appeal the order of the Twenty-First Judicial District Court, Ravalli County, terminating their parental rights. We affirm.

¶2     We review the following issues on appeal:

¶3     *Does substantial evidence support the District Court's adjudication of I.B. as a youth in need of care?*

¶4     *Did the District Court abuse its discretion when it terminated B.K.'s and C.B.'s parental rights to I.B.?*

¶5     *Did the District Court correctly conclude that the Department made active efforts to prevent breakup of the Indian family?*

¶6     *Did the parents receive effective assistance of counsel?*

FACTUAL AND PROCEDURAL BACKGROUND

¶7     The Montana Department of Public Health and Human Services (Department) removed I.B. from his parents' care on June 25, 2008. I.B. was about five months old at the time of removal. The parents neglected to provide I.B. with necessary medical care. The court adjudicated I.B. a youth in need of care and the parents stipulated to treatment plans in July 2008. The court granted the Department's petition to terminate B.K.'s and C.B.'s parental rights on July 21, 2010.

¶8     B.K. and C.B. left three-month-old I.B. in the sun on May 5, 2008. I.B. suffered a blistering facial sunburn and second degree burns on 20-30% of his body. I.B.'s sunburn required hospitalization, including oxygen supplements, heart-monitoring, intravenous

2

therapy, and blood draws. Community Medical Center in Missoula admitted I.B. on May 6, 2008. I.B. presented breathing difficulties, wheezing, a rapid heart rate, and possible deafness and blindness. I.B.'s doctors refused to discharge I.B. until May 16, 2010, due in part to concerns about the parents' ability to care for I.B. I.B.'s doctors believed that B.K. and C.B. could not understand, and were not following, medical care instructions that had been given to them following I.B.'s premature birth. The Department received an abuse or neglect referral and investigated.

¶9 Medical providers identified special medical needs of I.B. I.B.'s medical needs related back to his premature birth. The record does not clearly indicate to what extent the sunburn incident affected I.B.'s respiratory condition. The medical providers specifically instructed B.K. and C.B. how to care for I.B. They instructed them that I.B. must be fed on a rigid schedule and in a specific manner. The medical providers believed that I.B. would aspirate and could possibly die if not fed in this specific manner. They instructed the parents to hold I.B. in an upright position, hold his bottle, allow him to suck two to four times, and then remove the nipple to allow him to breathe. They also instructed them to monitor I.B.'s breathing closely and to keep a record of feeding times and breathing conditions. I.B. required a closely monitored feeding schedule because he did not signal when he needed to be fed.

¶10 Medical providers and the Department had concerns that B.K. and C.B. would not follow the feeding routine and manner. The Department hired Family Concepts, an independent organization that provides family support services, to assist in educating and

3

training B.K. and C.B. to take care of I.B. Anna Marie White, a family support worker for Family Concepts, provided B.K. and C.B. with supervised visitation, parenting classes, and in-home services. White met the parents at the hospital and initially assisted them five times a week in their home. White instructed the parents in the feeding technique ordered by I.B.'s doctors and implemented a feeding schedule.

¶11 White also assisted B.K. and C.B. in cleaning up their yard and making it safe. The yard contained pieces of metal, old fences, sharp tools, motor parts, and other trash that presented safety concerns. Safety concerns also existed inside the home. The Department found that the interior of the home needed to be cleaned. Many small items on the floor of the home presented choking and safety hazards to I.B.

¶12 B.K. and C.B. consistently had difficulty implementing the correct feeding technique or following the feeding schedule on their own. White suspected that the parents would not feed I.B. properly without her direct supervision. She suspected that they left I.B. unattended in his infant carrier with a bottle propped in his mouth. White confronted B.K. about propping the bottle in this manner. B.K. admitted that she had been propping the bottle. The bottle propping posed the risk that I.B. would choke or aspirate vomit. B.K. also admitted that she had not been keeping the record of feeding times because she considered the record-keeping to be "stupid."

¶13 The Department's social workers visited I.B.'s home unannounced on June 25, 2008, and found I.B. with a bottle propped in his mouth in clear disregard of the specified feeding technique. B.K. made no effort to hold or feed I.B. properly. B.K. busied herself instead by

4

cleaning the kitchen. The Department determined that B.K. and C.B. were not able to meet I.B.'s needs or provide for his health and safety. The Department removed I.B. from his parents' home and took him to the Marcus Daly Memorial Hospital due to respiratory concerns, including wheezing. The Department later transferred I.B. to foster care, where he had remained for about two years before the court ordered termination of parental rights.

¶14 The Department filed a petition seeking emergency protective services, adjudication of I.B. as a youth in need of care, and temporary legal custody. The court held an adjudication hearing. The court found that B.K. and C.B. had failed to follow simple feeding instructions that I.B.'s medical doctors had ordered. The court adjudicated I.B. a youth in need of care and granted temporary legal custody to the Department. The parents stipulated to treatment plans proposed by the Department that addressed their care for I.B. and his medical needs, the safety and condition of the parents' home and yard, and I.B.'s attachment to his parents. The parents agreed to complete the treatment plans' tasks by January 15, 2009.

¶15 B.K. and C.B. did not realize that I.B. was eligible for enrollment in the Cherokee Nation when the court adjudicated I.B. a youth in need of care. The parents apparently did not know of their own Native American heritage until after the Department began intervention proceedings. The parents enrolled I.B. in the Cherokee Nation sometime in early 2009. The court held a hearing on March 11, 2009, and heard testimony from an Indian Child Welfare Act (ICWA) expert, Eleanor LaMere. LaMere testified that physical and emotional risks existed in the parents' home and that I.B.'s immediate return to the

5

parents' care would result in serious emotional or physical harm to him. LaMere recommended that I.B. remain in foster care and that the court give the parents time to finish their parenting classes. The Cherokee Nation filed a notice of intervention on August 11, 2009, and later informed that it would monitor the proceedings. The Cherokee Nation did not object to I.B.'s foster family placement or the Department's efforts to provide rehabilitation services.

¶16 The court heard testimony for five days in a termination hearing that extended from October 2009 to May 2010. The Department presented the testimony of a clinical psychologist, a neuropsychologist, a licensed clinical social worker, a pediatric nurse practitioner, two family support workers from Family Concepts, the foster mother, a Department social worker, a Department family support specialist, an ICWA expert, and the Court Appointed Special Advocate (CASA). Several of the Department's witnesses recommended termination of B.K.'s and C.B.'s parental rights to I.B. The parents presented the testimony of a clinical psychologist who opined that the parents could learn the necessary parenting skills within a reasonable time. The trial testimony and other relevant facts will be discussed further as needed.

¶17 The court determined that B.K. and C.B. had failed to complete or comply with their treatment plans. B.K.'s and C.B.'s conduct and condition rendered them unfit to provide adequate parental care to I.B. Their condition was unlikely to change within a reasonable time. The court concluded that the evidence supported termination of B.K.'s and C.B.'s parental rights to I.B. beyond a reasonable doubt.

## STANDARD OF REVIEW

¶18 We review for abuse of discretion a district court's termination of parental rights. *In re B.M.,* 2010 MT 114, ¶ 14, 356 Mont. 327, 233 P.3d 338. We determine whether the district court's findings of fact are clearly erroneous and whether the conclusions of law are correct. *Id.* Where ICWA applies, we will uphold a district court's termination of parental rights if a reasonable fact finder could conclude beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child. *In re J.M.,* 2009 MT 332, ¶ 12, 353 Mont. 64, 218 P.3d 1213. This Court exercises plenary review to determine whether a parent has been denied effective assistance of counsel. *In re B.M., ¶* 14.

## DISCUSSION

¶19 *Does substantial evidence support the District Court's adjudication of I.B. as a youth in need of care?*

¶20 The State must present evidence to establish by a preponderance of the evidence that a child has been abused, neglected, or abandoned in order for a district court to adjudicate a child as a youth in need of care. Sections 41-3-437(2), -102(34), -422(5)(a), MCA; *In re B.S.,* 2009 MT 98, ¶ 22, 350 Mont. 86, 206 P.3d 565. The abuse may be actual physical or psychological harm to a child or substantial risk of physical or psychological harm caused by a parent's acts or omissions. Section 41-3-102(7), MCA; *In re A.S.,* 2006 MT 281, ¶ 30, 334 Mont. 280, 146 P.3d 778. ICWA standards of proof apply if the proceeding involves an Indian child. Section 41-3-422(5)(b), MCA.

¶21 The District Court concluded in its adjudication of I.B. as a youth in need of care that ICWA did not apply. The parties did not know of I.B.'s eligibility for tribal enrollment during the adjudication proceedings. The parents agree that the District Court could not have incorrectly applied the evidentiary standard during the adjudication proceedings when no one knew that I.B. potentially qualified as an Indian child. *Jared P. v. Glade T.*, 209 P.3d 157, 161-62 (Ariz. App. 2009) (citations omitted). The parents argue nevertheless that substantial evidence does not support by a preponderance of the evidence the court's adjudication of I.B. as a youth in need of care.

¶22 The court found that B.K. and C.B. had subjected I.B. to actual physical harm and a substantial risk of physical harm. I.B. received a severe sunburn that required hospitalization due to the parents' neglect. The parents disregarded the specific feeding techniques ordered by I.B.'s doctors. I.B.'s doctors had warned the parents of the risk of death presented by I.B.'s respiratory condition if they did not follow the specified feeding manner. The doctors and social worker from Family Concepts explained the required feeding method, emphasized the choking and aspirating risks to I.B., and taught the method to the parents in the hospital and in their home.

¶23 Despite the efforts to help B.K. and C.B. understand the importance of the feeding method to I.B.'s health and life, the Department in an unannounced visit found I.B. with a bottle propped into his mouth while B.K. cleaned in the kitchen. The parents argue that B.K. had to prop the bottle in I.B.'s mouth so that she could clean the house to impress the Department. The housecleaning excuse demonstrates their inability or refusal to understand

8

the life-threatening risks presented by improperly feeding I.B. Substantial evidence supports the District Court's adjudication of I.B. as a youth in need of care.

¶24 *Did the District Court abuse its discretion when it terminated B.K.'s and C.B.'s parental rights to I.B.?*

¶25 A district court may terminate an individual's parental rights if (1) the child has been adjudicated a youth in need of care, (2) an appropriate treatment plan has not been complied with by the parent or has not been successful, and (3) the conduct or condition of the parent rendering the parent unfit is unlikely to change within a reasonable time. Section 41-3-609(1)(f), MCA. B.K. and C.B. enrolled I.B. in the Cherokee Nation prior to the termination hearing. ICWA requires that the Department prove that B.K.'s and C.B.'s parental rights should be terminated beyond a reasonable doubt. 25 U.S.C. § 1912(f); *In re G.S.*, 2002 MT 245, ¶ 33, 312 Mont. 108, 59 P.3d 1063. ICWA also requires the court to find that the Department made active efforts for reunification and that reunification presents a risk of serious emotional or physical harm to the child. 25 U.S.C. § 1912; *In re G.S.*, ¶ 26. The parents appeal separately the active efforts requirement. We discuss the active efforts requirement under the third issue.

¶26 The parents argue that substantial evidence does not support the court's findings that the parents failed their treatment plans. B.K. and C.B. stipulated to the Department's proposed treatment plans on July 30, 2008, and received updated plans on April 15, 2009. The plans required B.K. and C.B. to understand and correct the circumstances causing removal, to acquire necessary parenting skills, to provide a safe and stable environment for

9

I.B., and to strengthen and preserve the parent-child relationship. The plans identified the parents' consistent failure to recognize safety hazards in the home, the failure to meet I.B.'s developmental needs, and the lack of an appropriate parent-child attachment as conditions that led to removal. The plans assigned the parents several tasks to address these problems.

¶27 A parent does not successfully complete a treatment plan by partial, or even substantial, compliance. *In re D.F.*, 2007 MT 147, ¶ 30, 337 Mont. 461, 161 P.3d 825. A parent technically can complete all the tasks in a treatment plan and not necessarily be successful in overall treatment. *In re S.C.*, 264 Mont. 24, 29, 869 P.2d 266, 269 (1994). A parent successfully completes a plan when he or she effectuates the purposes for which the plan had been designed. Section 41-3-609(1)(f)(i), MCA; *In re L.H.,* 2007 MT 70, ¶ 19, 336 Mont. 405, 154 P.3d 622. District courts must do more than mechanistically check items off a task list. District courts must determine instead whether the parents have actually effectuated the purposes of the treatment plan. *Id.*; *In re L.H.*, ¶ 19.

¶28 The Department's social worker, Kathryn Huber, testified about B.K.'s and C.B.'s compliance with the treatment plan and its tasks. Huber testified that B.K. attended parenting classes, participated in therapy, and could meet basic physical needs of I.B. Huber also testified that B.K. did not recognize I.B.'s cues when he communicated his needs or that he was upset. Huber testified that C.B. had not completed his parenting classes and failed to understand child development.

¶29 Huber testified that B.K. and C.B. did not demonstrate the ability to meet I.B.'s emotional needs and could not appropriately interact or communicate with I.B. B.K. often

10

ended visitation sessions earlier than scheduled. Visitation supervisors did not believe that B.K. and C.B. possessed the skills to permit unsupervised visitation with I.B. The parents also did not demonstrate an independent ability to correct potential safety hazards in their home, such as small items and cigarette butts that presented a choking hazard.

¶30 Huber testified that the parents had not been able to develop an appropriate, secure attachment to I.B. I.B. exhibited symptoms of post-traumatic stress disorder on several occasions after interacting with his parents. Early in her support services, Anna Marie White of Family Concepts expressed concern with the lack of physical or emotional interaction between I.B. and his parents. I.B. remained passive in his parents' presence and would not cry or signal his needs to his parents. When White began coaching the parents on interaction methods, I.B. resisted his parents and would pull himself away from their care.

¶31 I.B.'s resistance escalated in the spring of 2009. He refused to eat or drink when his parents tried to feed him. He resisted being held by them and turned away from them. He often zoned out or entered staring spells. Benjamin Ross, a pediatric neurologist, evaluated I.B. and conducted an EEG for the staring spells. Ross ruled out seizures and all other possible medical conditions as causes of the staring spells.

¶32 I.B. would not engage with his parents. Social workers, visitation supervisors, and the foster mom reported that I.B. demonstrated a complete change of demeanor in the presence of B.K. and C.B. I.B.'s foster mother reported that I.B. seemed aggressive and resistant to touch after supervised visits with B.K. and C.B. I.B. began vomiting and developed cyanosis and a rash coincident with the parental visitations. I.B.'s pediatric nurse practitioner, Devry

Garity, investigated I.B.'s vomiting and cyanosis. Garity ruled out anatomical causes and other medical reasons for the vomiting. Garity determined that the cyanosis related to I.B.'s vomiting episodes. Garity had no other explanation for the cyanosis. A pediatric allergist evaluated I.B. and ruled out allergic reaction as a cause for the rashes. Garity indicated that the episodes of vomiting, cyanosis, rash, and staring ceased after suspension of the visits between I.B. and his parents.

¶33    B.K. underwent a psychological evaluation with Theresa Reed, a licensed clinical psychologist. Reed found B.K.'s cognitive abilities to be in the low average range and diagnosed B.K. with Personality Disorder Not Otherwise Specified. Reed reported that B.K. lacks insight, tends to be defensive, exhibits low coping ability in her role as primary caregiver, and exhibits ineffectual parenting. Reed reported that B.K.'s cognitive function ranged in the low average, between fifth and sixth grade. Reed opined that B.K. presented a poor candidate for therapy.

¶34    C.B. underwent a neuropsychological evaluation with Jacqueline Day, a neuropsychologist. Day diagnosed C.B. with Cognitive Disorder Not Otherwise Specified and Borderline Intellectual Functioning. C.B. has a full scale IQ of 72. Day noted cerebral dysfunction that would adversely affect his parenting skills. Day opined that C.B.'s condition would continue to qualify him for SSI disability benefits.

¶35    The Department hired Julie Telfer, a licensed clinical social worker, to conduct a family systems analysis that evaluated the attachment and safety of the relationship between I.B. and his parents. Telfer expressed many of the same concerns as Huber and White,

determined that it was not safe for I.B. to be returned to his parents, and recommended termination. Joni Kicking Woman, a qualified ICWA expert, testified that evidence proved beyond a reasonable doubt that continued custody likely would result in serious emotional or physical damage to I.B. The testimony of Telfer and Kicking Woman supported the Department's recommendation to terminate B.K.'s and C.B.'s parental rights. Sufficient evidence supports the District Court's conclusion that evidence proved beyond a reasonable doubt that all the statutory requirements of § 41-3-609(1)(f), MCA, had been satisfied and that continued custody by the parents likely would result in serious emotional or physical harm to the child. 25 U.S.C. § 1912(f); *In re G.S.*, ¶ 26.

¶36    The parents argue that the testimony of their clinical psychologist, Coleen Wall-Hoeben, raised a reasonable doubt as to whether their conduct or condition rendering them unfit was likely to change within a reasonable time. The parents argue that the District Court should have agreed with Wall-Hoeben that no risk of harm existed in returning I.B. to his parents because Wall-Hoeben had a doctorate degree whereas Julie Telfer, the licensed clinical social worker hired by the Department, held only a masters degree. Despite the disparity in educational credentials, the court found that Telfer had "specialized training concerning infant mental and emotional health and attachment issues." The court highlighted this distinction when it found that "no other witness had the level of training" comparable to Telfer. The court further found "persuasive Julie Telfer's explanation that Dr. Wall-Hoeben was hired by the parents to provide psychotherapy to them, rather than to serve in a forensic role related to [I.B.'s] best interests." This Court will not substitute its

judgment for that of the District Court's regarding the credibility, persuasiveness, and weight to be given to a witness's testimony. *In re K.J.B.,* 2007 MT 216, ¶ 23, 339 Mont. 28, 168 P.3d 629.

¶37 *Did the District Court correctly conclude that the Department made active efforts to prevent breakup of the Indian family?*

¶38 ICWA requires the Department to make active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family. 25 U.S.C. § 1912(d). Active efforts imply a heightened responsibility for the Department to take timely, affirmative action to avoid the breakup of the Indian family. *In re T.W.F.,* 2009 MT 207, ¶ 27, 351 Mont. 233, 210 P.3d 174; *In re G.S.,* ¶ 36. The parents agree that they cannot dispute that the Department made active efforts and provided services to them throughout these proceedings. We agree and believe it unnecessary to list the many services provided by the Department. Those services began before removal and continued throughout these proceedings.

¶39 The parents contend, however, that the Department's "efforts and services were not aimed at preventing the break-up of the family." The parents argue that the Department's efforts and services "severely damaged the bond between I.B. and his parents and actually prevented reunification of the family." The parents argue that the Department provided visitation services as "test sessions for the parents" and that I.B.'s stress resulted from the infrequent and irregular visitation schedule, rather than from the parents' lack of attachment

14

to I.B. and poor parenting skills. The parents complain that the Department did not adequately provide counseling, educational services, or therapy.

¶40 The record does not support the parents' assertion that the Department set the parents up for failure by not providing more visitation sessions and therapy. The Department promptly explained why it removed I.B. from the parents' home and what the parents needed to provide before I.B. could be returned. The Department provided in-home trainings, parenting classes, parenting coaching, psychological evaluations to understand better the parents' abilities and limitations, transportation, and visitation services. The record does not support the parents' argument that the many services provided by the Department actually caused the family's breakup.

¶41 We disagree with the parents that the Department actually caused these proceedings to end in termination. ICWA requires heightened efforts by the Department. *In re T.W.F.*, ¶ 27. Nothing in ICWA guarantees, however, that those efforts will be successful. *See e.g. In re G.S.*, ¶ 37. The success of the remedial services and rehabilitative programs concomitantly depends on the parents' ability and willingness to develop the necessary skills to provide their child with a safe living environment. *In re T.W.F.*, ¶ 27. Substantial evidence supports the District Court's findings regarding the services and programs that the Department provided to the parents. The District Court correctly concluded that the Department made active efforts to provide remedial and rehabilitative services to the parents that were designed to prevent the breakup of the family.

¶42 *Did the parents receive effective assistance of counsel?*

15

¶43 The parents argue that their counsel provided ineffective assistance when she did not secure an ICWA expert to rebut the Department's ICWA expert's testimony that returning I.B. to his parents would likely result in serious harm. This Court determines a trial counsel's effectiveness by reviewing his or her 1) training and experience, and 2) advocacy skills. *In re B.M.*, ¶ 22. Only if the parent suffered prejudice, however, will this Court determine that trial counsel's ineffective performance warrants reversal. *Id.* Nothing in the trial record reveals that the parents' counsel lacked adequate training and experience to represent them or that their counsel's advocacy skills were ineffective.

¶44 The parents argue only that their trial counsel's failure to present expert rebuttal testimony on the ICWA standard prejudiced them. ICWA requires that a qualified expert witness testify during termination hearings regarding whether continued custody of the child by the parent likely would result in serious emotional or physical damage to the child. 25 U.S.C. § 1912(f). ICWA does not require both the Department and the parents to present qualified expert witnesses. Such a requirement would create an impossible situation for counsel if no qualified expert existed who would testify favorably for the parents. The trial counsel's decision not to present rebuttal testimony does not constitute ineffective assistance of counsel.

¶45 Joni Kicking Woman, a qualified ICWA expert, testified that returning I.B. to his parents' care would result in serious harm beyond a reasonable doubt. B.K.'s and C.B.'s trial counsel had an opportunity to cross-examine Kicking Woman. The parents have not

shown that their trial counsel's cross-examination of Kicking Woman constituted ineffective assistance of counsel or prejudiced their case.

¶46    Affirmed.


/S/ BRIAN MORRIS


We Concur:


/S/ JAMES C. NELSON
/S/ MICHAEL E WHEAT
/S/ PATRICIA COTTER
/S/ JIM RICE

17