FILED

12/02/2025

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 25-0073

DA 25-0073

IN THE SUPREME COURT OF THE STATE OF MONTANA

2025 MT 274

IN THE MATTER OF:

J.D.,

     A Youth in Need of Care.

APPEAL FROM:    District Court of the Fifth Judicial District,
In and For the County of Beaverhead, Cause No. DN-1-2023-875
Honorable Luke Berger, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Allen P. Lanning, Law Office of Allen P. Lanning, PC, Great Falls,
Montana

    For Appellee:

        Austin Knudsen, Montana Attorney General, Mardell Ployhar,
Assistant Attorney General, Helena, Montana

        Sky Jones, Beaverhead County Attorney, Dillon, Montana

        Submitted on Briefs:  August 20, 2025

        Decided:  December 2, 2025

Filed:

                           _____
                                  Clerk

Justice Ingrid Gustafson delivered the Opinion of the Court.

¶1    S.M. (Mother) appeals from the April 19, 2023 Order adjudicating J.D. as a youth in need of care (YINC) and the December 11, 2024 Decree of Guardianship entered by the Fifth Judicial District Court, Beaverhead County. We restate and address the following dispositive issue:

*Did the District Court abuse its discretion when it adjudicated J.D. as a YINC?*

¶2    We reverse and vacate the April 19, 2023 Order adjudicating J.D. as a YINC and the December 11, 2024 Decree of Guardianship.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3    The Department of Public Health and Human Services, Child and Family Services Division (the Department) removed J.D. after receiving a report that Mother was arrested on February 7, 2023, for allegedly making multiple inappropriate calls, over a period of two years, to the Beaverhead County Sheriff Department dispatch. J.D. was 14 years old at the time of Mother's arrest and did not have another adult with legal custody to care for him. Mother's sister, T.M., lived in Butte and Mother identified her as a possible placement for J.D. The Department placed J.D. with T.M. on an emergency basis.

¶4    Children Protection Specialist (CPS) Brenda Kirkley interviewed Mother while she was in custody and when she was released on February 28, 2023. CPS Kirkley stated that Mother informed her that Mother believed she had been under hypnosis, that Mother used Narcan to "knock off the hypnosis," and that Mother yelled at CPS Kirkley, accused the government of conspiring against her, and had trouble communicating in a clear manner,

2

as well as difficulty regulating emotions. Mother reported she was not under the influence of drugs and a urinalysis confirmed she was not.

¶5 CPS Kirkley also received reports from the Beaverhead County Detention Center that Mother had been acting erratically by screaming, banging on pipes, and being uncooperative with officers while in custody. A review of the Department's prior involvement with Mother reflected concerns regarding Mother's mental health.

¶6 On March 8, 2023, the Department filed a petition for emergency protective services, adjudication of J.D. as a YINC, and temporary legal custody. The Department supported its petition with an affidavit from CPS Kirkley explaining that the Department believed J.D. had been neglected and required immediate protection due to the status of Mother's mental health. The District Court issued an order granting the Department's requested relief and the Department continued J.D.'s placement with T.M.

¶7 At the March 21, 2023 show cause hearing, although Mother denied the Department's allegations, she stipulated to cause. The District Court scheduled an adjudicatory hearing for mid-April 2023 so Mother could complete the mental health evaluation requested by the public defender representing Mother in her criminal case.

¶8 The District Court held a contested adjudication hearing on April 18, 2023. The Department presented testimony from CPS Kirkley and Chief of Police Jeremy Alvarez. Mother testified on her own behalf. CPS Kirkley testified that she was familiar with the Montana Safety Assessment and Management System (SAMS) used by the Department to assess when a family condition becomes a true safety threat requiring intervention, but CPS Kirkley could not remember SAMS's five criteria for assessment. As to the present danger

3

criteria requirement, that is, an "[i]mmediate, significant and clearly observable family condition (or threat to child safety) that is . . . actively occurring . . . and will likely result in severe (serious) harm to a child, requiring immediate protective response," Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S, CPS Kirkley testified that Mother had thrown objects at J.D. and, at some unknown time in the past, Mother may have physically assaulted J.D. but CPS Kirkley admitted that she was unaware of any injuries to J.D. When asked about the immediate or imminent harm criteria requirement, that is, the belief that danger will remain active resulting in "circumstances that reasonably could result in severe harm to a vulnerable child now or within days," Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S, CPS Kirkley advised that she believed J.D. had told a different CPS worker that Mother had thrown coffee cups at him 5 months earlier in September 2022. When questioned about severity, that is, "the effects of maltreatment that have already occurred and/or the potential for harsh effects based on the vulnerability of a child and the family behavior, condition, or situation that is out of control," Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S, CPS Kirkley testified she had observed Mother demonstrate concerning mental health symptoms of rapid mood escalation and being "in an alternate reality" but did not tie these observations to conduct directed at or involving J.D. Regarding J.D.'s level of vulnerability and self-protective capacities, that is, J.D.'s dependence on others for protection, Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S, CPS Kirkley admitted that J.D. had protective capacities of

4

his own and was not dependent on others for some of his basic needs. Finally, when asked about out-of-control family conditions, which are conditions affecting a child that "are unrestrained; unmanaged; without limits or monitoring; not subject to influence, manipulation or internal power; are out of the family's control," Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S, CPS Kirkley again reiterated her prior testimony about her observations of Mother's mental health related behaviors. CPS Kirkley did not, however, tie these behaviors to a negative effect on J.D. or indicate how these behaviors were unmanaged or out-of-control in relation to Mother's parenting of J.D. Upon conclusion of the testimony, J.D.'s counsel advised the court that J.D. was not scared of or uncomfortable with his mom.

¶9 The District Court issued an order on April 19, 2023, adjudicating J.D. a YINC. The District Court's primary concern was J.D.'s well-being if returned to Mother's care because the witnesses' testimony indicated Mother was unstable due to her mental health. The court recognized that while J.D. was self-sufficient to a certain extent, he was still a youth who needed a parent to ensure he attended school and had access to basic life necessities such as food, medical attention, and shelter. The adjudication order granted the Department temporary legal custody of J.D. for six months. The Department continued J.D.'s placement with T.M.

**STANDARD OF REVIEW**

¶10 We review a district court's decision to grant or deny a petition to adjudicate a YINC for abuse of discretion. *In re K.H.*, 2012 MT 175, ¶ 19, 366 Mont. 18, 285 P.3d 474. "A court abuses discretion when it acts arbitrarily, without employment of conscientious

5

judgment or in excess of the bounds of reason, resulting in substantial injustice." *In re A.J.W.*, 2010 MT 42, ¶ 12, 355 Mont. 264, 227 P.3d 1012 (citation omitted). We review a district court's findings of fact for clear error, its conclusions of law for correctness, and the court's ultimate decision regarding adjudication for abuse of discretion. *In re K.H.*, ¶ 19. "A finding of fact is clearly erroneous when it is not supported by substantial evidence, the court misapprehended the effect of the evidence, or review of the record convinces this Court a mistake was made." *In re L.B.*, 2025 MT 6, ¶ 8, 420 Mont. 192, 562 P.3d 497 (citation omitted). "Substantial evidence is evidence that a reasonable mind might accept as adequate to support a conclusion, even if weak and conflicting." *In re J.H.*, 2016 MT 35, ¶ 24, 382 Mont. 214, 367 P.3d 339 (citation omitted). When determining if substantial evidence supports the district court's findings, the evidence is viewed in the light most favorable to the prevailing party. *In re J.H.*, ¶ 13.

## DISCUSSION

¶11 *Did the District Court abuse its discretion when it adjudicated J.D. as a YINC?*

¶12 The District Court's finding of abuse and neglect is not supported by substantial evidence. Accordingly, we reverse and vacate the District Court's April 19, 2023 adjudication of J.D. as a YINC and, likewise, vacate the subsequent guardianship order.

¶13 Pursuant to § 41-3-101(1)(d), MCA,[1] no forced removal of a child from the child's family is warranted, unless the Department has reasonable cause to suspect the child is at *imminent* risk of harm. The statutory threshold for adjudication of a YINC requires the

---

[1] Unless otherwise noted, all statutory citations are to the 2023 version of the Montana Code Annotated.

Department to prove by a preponderance of the evidence that the child has been abused, neglected, or abandoned. Sections 41-3-437(2), -102(36), MCA. "Child abuse or neglect" is defined as "actual physical or psychological harm to a child," a "substantial risk of physical or psychological harm to a child," or abandonment of a child. Section 41-3-102(7), MCA. "Physical or psychological harm" means "harm that occurs whenever the parent or other person responsible for the child's welfare inflicts or allows to be inflicted on the child physical abuse, physical neglect, or psychological abuse or neglect." Section 41-3-102(23), MCA. "Psychological abuse or neglect" is defined as "severe maltreatment, through acts or omissions, that is injurious to the child's intellectual or psychological capacity to function *and that is identified* as psychological abuse or neglect *by a licensed [professional]*." Section 41-3-102(25)(a), MCA (emphasis added).

¶14 The District Court determined the nature of the abuse or neglect set forth by the Department in this case to be "physical neglect." Physical neglect is defined as:

> (a) failure to provide basic necessities, including but not limited to appropriate and adequate nutrition, protective shelter from the elements, and appropriate clothing related to weather conditions;
> (b) failure to provide cleanliness and general supervision, or both;
> (c) exposing or allowing the child to be exposed to an unreasonable physical or psychological risk to the child;
> (d) allowing sexual abuse or exploitation of the child; or
> (e) causing malnutrition or a failure to thrive.

Section 41-3-102(22), MCA. The District Court's finding of physical neglect was premised on Mother's mental health and her alleged failure to provide basic necessities to J.D., as well as the unreasonable physical and psychological risk Mother's mental health allegedly presented to J.D.

7

¶15 Abuse and neglect proceedings balance two important and opposing state interests: the state's duty to protect children whose health and welfare may be adversely affected by the conduct of those responsible for them, and the fundamental presumption that a child's best interests are ordinarily served by preserving the family unit, which makes state intervention a grave and cautious undertaking. *See* § 41-3-101(1), MCA. In accordance with state policy and to properly address whether a youth is a YINC, the Department has implemented the SAMS model to ensure that safety assessments guide decision making throughout the life of a case. *See Matter of B.H.*, 2020 MT 4, ¶ 34, 398 Mont. 275, 456 P.3d 233; Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S.

¶16 Upon receipt of a report that a child is or has been abused or neglected, our statutory scheme provides that the Department "shall promptly assess the information contained in the report and make a determination regarding the level of response required." Section 41-3-202(1)(a), MCA. If the Department determines that an investigation and safety and risk assessment are warranted in response, "a child protection specialist shall promptly conduct a thorough investigation into the circumstances surrounding the allegations . . . and perform a safety and risk assessment to determine whether the living arrangement presents an unsafe environment for the child." Section 41-3-202(c), MCA. A safety and risk assessment requires a CPS to assess "(a) the existing threat or threats to the child's safety; (b) the protective capabilities of the parent or guardian; (c) any particular vulnerabilities of the child; (d) any interventions required to protect the child; and (e) the

8

likelihood of future physical or psychological harm to the child." Section 41-3-102(30), MCA.

¶17 The Department utilizes SAMS to accomplish the statutorily required "safety and risk assessment." SAMS employs a "safety threshold" throughout the assessment process to determine when a family condition becomes a true safety threat requiring intervention. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S. The safety threshold guides child protection specialists in deciding whether a child is safe or unsafe by evaluating whether five criteria are met: (1) the potential harm is severe, (2) the harm is imminent, (3) the danger is clearly observable, (4) the child is vulnerable and dependent on others for protection, and (5) the family conditions are out of control or unmanaged. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S. The threshold is applied throughout the life of the case to distinguish between risk and actual danger, ensuring that intervention occurs only when these safety conditions are clearly present. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S.

¶18 The SAMS model emphasizes that safety decisions must be based on clear, consistent assessments of present and impending safety threats—not isolated incidents— and that removal is justified only when no home safety plan can control such threats. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S. SAMS further requires the Department to use precise procedures, sound judgment, and family-centered, strength-based practices to enhance caregiver protective capacities before

9

resorting to separation. Child and Family Services Policy Manual, § 201-2 (DPHHS 2015), https://perma.cc/43P4-F24S.

¶19 By ignoring the SAMS safety threshold and removing J.D. absent any real or imminent danger, the Department abandoned the safeguards it specifically designed to prevent unnecessary family disruption and it ultimately provided insufficient evidence to establish J.D. as a YINC.

¶20 This Court's precedent "instructs a district court to look to a parent's past conduct to inform the exercise of its discretion in abuse and neglect proceedings." *In re K.H.*, ¶ 38. The focus of our analysis therefore must be the effect of the parent's conduct on the child, and whether that conduct has resulted in, or presents a substantial risk of, abuse or neglect. *See In re K.H.*, ¶¶ 38-39; *In re G.S.*, 2002 MT 245, ¶ 43, 312 Mont. 108, 59 P.3d 1063; *In re I.B.*, 2011 MT 82, ¶¶ 22-23, 360 Mont. 132, 255 P.3d 56. Thus, the focus in this case is the effect of Mother's conduct on J.D. and whether the Department proved at the adjudication hearing, by a preponderance of evidence, that Mother's conduct resulted in, or presented a substantial risk of, either (1) a failure to provide J.D. with basic necessities, or (2) an exposure of J.D. to unreasonable physical or psychological risk.

¶21 Mother had raised J.D. on her own since his birth and provided for all of J.D.'s ordinary needs in a relatively stable manner before removal, including providing housing, food, having stable income and employment, providing clothing, and sharing household chores with him. At the time of the adjudication hearing, there was no evidence of J.D.'s physical or emotional needs not being met. At the adjudication hearing, other than attesting to a general concern for J.D.'s safety stemming from Mother's unrelated behaviors, the

10

Department failed to establish actual physical or psychological harm to J.D., or a substantial risk of physical or psychological harm to J.D.[2] While the Department's initial intervention may have been warranted when Mother was first arrested, the Department is obligated to continuously assess its cases and withdraw its involvement when a caregiver's protective capacities become sufficient. *See* § 41-3-423(1)(b)(i), (ix), MCA (requiring the Department to monitor progress and continuously conduct comprehensive assessments of the family's circumstances "with a focus on safe reunification as the most desirable goal"). At the time of the adjudication, Mother was maintaining a three-bedroom townhouse as a residence, had an income as a part-time delivery driver, and there were no allegations that she was not providing for J.D.'s basic necessities. J.D. was an independent and competent teenager, capable of taking on many of his own needs, including cooking, laundry, and getting to and from school. None of the SAMS safety conditions were clearly present, let alone all five as is necessary to warrant removal under the Department's own policies.

¶22 CPS Kirkley's affidavit and the testimony presented at the adjudication hearing did raise concerns over Mother's mental health. However, the mere fact that a parent has a mental illness or disorder does not support a finding of abuse or neglect. While it is true that Mother exhibited abnormal conduct as a result of her mental health issues, our statutory scheme requires more than exhibiting abnormal conduct in relation to a mental health

---

[2] The District Court acknowledged at the conclusion of the hearing, "I have just got a general concern about the safety and risk if returned at this point with the youth." However, while we can appreciate a general concern, such is not "reasonable cause to suspect that the child is at imminent risk of harm" as required by § 41-3-101(1)(d), MCA, and is insufficient to adjudicate a child as a YINC under our statutory scheme.

11

condition. To adjudicate J.D. as a YINC, the Department was required to show that the abnormal conduct resulted in physical or psychological harm, or a substantial risk of such harm, to J.D.

¶23 Here, Mother's rambling testimony and her various statements about Narcan, hypnosis, and conspiracy theories all occurred outside of J.D.'s presence, are unrelated to J.D., and appear to have had no effect on J.D. Further, while Mother's admission that she may have inflicted physical pain on J.D. once in the past could raise valid concerns, the Department failed to establish this was anything other than a remote occurrence and it failed to substantiate any physical or mental harm to J.D. that resulted from the incident. Mother also explained that she had been undergoing changes in her medication at the time and it appears that she self-reported the incident to her doctor and had arranged for J.D. to stay with her sister temporarily—evidencing an appropriate understanding of her mental health issues and protective capacities to adequately care for J.D even while experiencing exacerbated mental health symptoms. Additionally, while the cup throwing incident raises similar concerns, the cups were Styrofoam and, once again, there was no nexus between Mother's conduct and any demonstrated physical or psychological harm to J.D. To be sure, J.D. stated that he does not fear his mother and the Department utterly failed to show "severe maltreatment, through acts or omissions, that [were] injurious to [J.D.'s] intellectual or psychological capacity to function." Section 41-3-102(25)(a), MCA.

¶24 The only fact that potentially shows an actual effect of Mother's mental health symptomatology on J.D. is J.D.'s school attendance record. CPS Kirkley testified that J.D. missed approximately 15 days of school. The District Court found this fact, along with

Mother's inability to explain the absences, to support its finding of abuse or neglect. However, Mother's testimony specifically referenced Covid as a basis for the high number of absences. Being that 36% of Montana students missed 10% or more of the 2022-2023 school year,[3] J.D.'s 15 absences, which constitute only 8.7% of scheduled school days,[4] can hardly be considered excessive or indicative of abuse or neglect without some context and relation to Mother's mental health and conduct. Further, there was no showing that J.D.'s absences had resulted in any educational difficulties or deficits—there was no evidence of J.D. failing any classes, engaging in any disruptive or inappropriate school behaviors, or not appropriately advancing in his education or meeting academic requirements.

¶25 Mother's testimony regarding her "clashing" with the school and her statement that J.D. was not supposed to meet with the school counselor also fail to demonstrate abuse or neglect. Rather, these facts show that Mother was actively involved in J.D.'s education. As a parent, Mother has a fundamental right to make decisions regarding the care of J.D., including, among other things, his upbringing, education, health care, and mental health. *Stand Up Mont. v. Missoula Cnty. Pub. Schs.*, 2022 MT 153, ¶ 28, 409 Mont. 330, 514 P.3d 1062; § 40-6-701, MCA. While the government has a compelling interest in protecting children from abuse and neglect, there are no facts showing that Mother's conduct towards

---

[3] *Chronic Absenteeism*, U.S. Dep't of Educ., https://perma.cc/4PN8-ZYXR (last visited Oct. 7, 2025).

[4] Dillon School District 10's 2022-2023 School Calendar included 172 school days. Dillon Elementary School District #10, *2022-2023 Dillon Elementary School District #10 District Calendar (revised 6-7-2022)*, Dillon Schools, June 7, 2022, https://perma.cc/3BTC-Z9LT.

the school had any negative effect on J.D. or his education. Accordingly, J.D.'s absences and Mother's involvement with the school fail to demonstrate abuse or neglect.

¶26 Mother's excessive calls to the Dillon Police Department also fail to demonstrate abuse or neglect. Mother's inability to explain the calls does suggest a lack of appreciation for the consequences of her conduct, which may put Mother at risk of repeating the offense in the future. However, while it is possible Mother could be rendered unable to care for J.D. if she were once again detained, J.D. is now 17 years old and the potential need for safety intervention at some unknown point in the future does not substantiate abuse or neglect, nor does it warrant immediate removal. *See* § 41-3-102(7)(a) (defining child abuse or neglect as "*actual* physical or psychological harm," "a *substantial risk* of such harm," or abandonment (emphasis added)); § 41-3-101(1)(d) (declaring it state policy to "ensure that there is no forced removal of a child from the family . . . unless the department has reasonable cause to suspect that the child is at *imminent* risk of harm" (emphasis added)).

¶27 The Department argues that Mother's mental health has subjected J.D. to the real possibility of physical and psychological harm and that a court need not wait until a child's emotional or psychological scars are beyond repair and observable. The Department is correct; courts need not wait until harm is beyond repair. However, this does not mean that abuse or neglect can be established upon the mere possibility of harm occurring in the future. Rather, the law requires a "*substantial risk* of physical or psychological harm to a child." Section 41-3-102(7)(a)(ii), MCA (emphasis added). Additionally, removal requires reasonable cause to suspect an *imminent* risk of harm. Section 41-3-101(1)(d), MCA (emphasis added). The focus of our inquiry remains not on the abnormality of the

14

parent's conduct, but the effect of the conduct on the child, and whether it creates a substantial risk of physical or psychological harm to the child for which there is reasonable cause to suspect the harm to be imminent. *See In re I.B.*, ¶¶ 22-23; §§ 41-3-102(7)(a)(ii), -101(1)(d), MCA.

¶28    Our case law addressing a substantial risk of harm as a basis for abuse or neglect is limited, but informative. This Court has upheld the adjudications of newborns, who have no self-protective capacities, as YINCs based on a substantial risk of harm, rather than actual abuse or neglect, where the parents' parental rights were previously terminated as to a sibling of the newborn and the circumstances related to the prior termination have not changed. *In re K.C.H.*, 2003 MT 125, ¶ 22, 316 Mont. 13, 68 P.3d 788; *In re C.P.*, 2001 MT 187, ¶ 20, 306 Mont. 238, 32 P.3d 754.

¶29    We also upheld the adjudication of a YINC where a parent's conduct clearly placed the child's life at risk. *In re I.B.*, ¶ 23. In *In re I.B.*, a child's doctor had ordered the child's parents to use a specific feeding method to feed the child due to the child's respiratory condition. *In re I.B.*, ¶ 22. The doctor and the family's social worker reviewed the method with the parents, explained why the method was necessary, and emphasized that a failure to follow the method would put the child at risk of choking or aspirating vomit. *In re I.B.*, ¶ 22. However, the parents disregarded the order and warnings, and a social worker conducting a home visit found the child, who was of an age with no self-protective capacities, with a bottle propped up in its mouth in the very manner the doctor specifically instructed the parents not to do. *In re I.B.*, ¶¶ 22-23. While the mother asserted that she propped the bottle up so that she could clean the house to impress the social worker, we

15

found this excuse only further demonstrated the parents' inability or refusal to understand the life-threatening risks presented by their conduct. *In re I.B.*, ¶ 23. We ultimately held that substantial evidence supported the district court's adjudication of the child as a YINC. *In re I.B.*, ¶ 23.

¶30     In addition to upholding adjudications of a YINC based on a substantial risk of physical harm, we have also upheld the adjudication of a YINC based upon a substantial risk of psychological harm. *In re D.T.H.*, 2001 MT 138, ¶ 14, 305 Mont. 502, 29 P.3d 1003. In *In re D.T.H.*, a 15-year-old girl conceived a child with her stepfather. *In re D.T.H.*, ¶ 3. The child's father (the mother's stepfather) ultimately divorced the child's grandmother, married the mother, and moved in with the mother and the child. *In re D.T.H.*, ¶ 3. The family's social worker testified that the child had not been subjected to any actual abuse or neglect, but went on to provide that the relationship between the mother and father raised serious concerns regarding the father's inclination to commit sexual offenses against children. *In re D.T.H.*, ¶ 4. The social worker further testified that the sexual abuse experienced by the mother, along with the mother's inability to recognize the impropriety of her sexual relationship with the father, made the mother unable to adequately parent and protect the child from harm. *In re D.T.H.*, ¶ 4. A psychosexual exam of the father was also presented, and though the exam concluded that the father did not pose a significant sexual abuse risk to the child based on the child's gender, the social worker who conducted the exam testified that the father should not have access to children—including both the child and the mother—based on the father being an untreated sex offender. *In re D.T.H.*, ¶ 16. The social worker also testified that the family unit

16

exhibited extremely poor boundaries and that the child's continued exposure to the family would prevent the child from developing the boundaries necessary to develop healthy relationships throughout the course of their lifetime. *In re D.T.H.*, ¶ 17. We found this evidence sufficient to support the district court's finding that the child had little hope of normal emotional, moral, and psychological development under their current conditions and was therefore at a substantial risk of harm while in the mother's care. *In re D.T.H.*, ¶ 19.

¶31 While these cases provide some insight into what establishes a substantial risk supporting the adjudication of a YINC, they do little to guide us on what fails to establish such a risk. To this end, a review of reversals in other jurisdictions is informative. *See In re K.M.*, 75 A.3d 224 (D.C. App. 2013) (reversing a district court's finding of neglect where a mother suffered delusions and paranoia, and expert testimony provided what "could" happen to "a child" as a result of the mother's condition, but no facts established that the mother's child was at risk of suffering a specific emotional or psychological injury as a result of the mother's mental illness); *In re David M.*, 36 Cal. Rptr. 3d 411, 416 (Cal. App. 4th Dist. 2005) (reversing a district court's finding of neglect that had been based on, among other things, the mental health of both parents and the mother's drug use due to the record lacking "any evidence of a specific, defined risk to either [child] resulting from mother's or father's mental illness, or mother's substance abuse," and the presented harms as being "merely speculative"); *In re Dahlia G.*, 10 N.Y.S.3d 113, 116 (N.Y. App. Div. 2d Dept. 2015) (reversing a finding of neglect of a 3-month old child who was present when the father engaged in an act of domestic violence against the mother based on there being

"no evidence that the child saw, or was aware of, what happened, or that his emotional condition was impaired or placed in imminent danger of impairment by it"); *S.S. v. Dept. of Child. Fams.*, 81 So. 3d 618, 623 (Fla. Dist. Ct. App. 2012) (reversing a finding of children being at risk of imminent harm based on, among other things, mother's psychological instability where evidence established that the mother engaged in self-harm and substance abuse but there was no expert testimony establishing a "likelihood that [the mother's psychological instability] will substantially impair the [children's] physical, mental, or emotional health"). From these collective cases, it follows that an adjudication based on a substantial risk of harm cannot stand where evidence shows only speculative or generalized concerns, rather than specific, concrete, and imminent threats of harm to a child caused by the parent's conduct.

¶32 Here, unlike *In re I.B.* and *In re D.T.H.*, J.D. was of an age to have significant self-protective capacities and there are no facts showing that Mother's mental health and delusional behaviors placed J.D.'s physical, emotional, or mental health at substantial risk of harm. Rather, the facts of this case more closely resemble those in which adjudications were reversed being that there is simply no evidence of a specific, defined risk to J.D. caused by Mother's mental health, only the mere existence of Mother's mental health disorder and the District Court's "general concern."

¶33 It is apparent Mother has suffered from mental health issues for some time. Despite this, she has raised J.D. and adequately provided for J.D.'s basic necessities and emotional needs. J.D. has appropriately advanced through school with no licensed professional identifying him with any physical or mental health problems. At the time of removal, J.D.

18

was 14 years old and by virtue of his age had protective capacities of his own—he exhibited the ability to dress and care for his personal appearance by himself, he exhibited the ability to prepare his own food and do laundry should he need to, to abide by a general schedule, to use a telephone, and seek assistance if something unusual occurred. Not only did J.D. have a good relationship with Mother, but he also had a good relationship with his grandmother and aunt, as well as the ability to call them for assistance.

¶34 While the Dissent notes various risk factors for teens in general, whether or not there could be merit in another case to the point that there is a risk of an unsupervised teenager getting into trouble, such does not apply to the facts of this case nor the application of the law to the facts of this case. While the record establishes an alleged "cause"—Mother's mental health and delusional behaviors—the record lacks evidence of an "effect" on J.D. The District Court only expressed a generalized concern over risks to J.D.'s health and well-being and failed to identify a specific, non-speculative, imminent risk. Accordingly, the record fails to establish a causal relationship between Mother's mental health and a substantial risk of physical or psychological harm to J.D. Being that there was no substantial risk of harm, there was no probable cause supporting an imminent risk of harm, as required under § 41-3-101(1)(d), MCA. Under these circumstances, there was insufficient evidence to adjudicate J.D. as a YINC and his removal from Mother's home was unwarranted.

¶35 As the District Court's finding of abuse and neglect was not supported by substantial evidence, the District Court's order adjudicating J.D. as a YINC and its subsequent dispositional order imposing a guardianship of J.D. warrant reversal and vacation.

19

Accordingly, it is not necessary for us to address Mother's additional claims, in which she asserts the Department failed to make reasonable efforts to prevent J.D.'s removal and reunify her with J.D., and that the Department's minimal efforts failed to comport with federal protections under the Americans with Disabilities Act (ADA).

## CONCLUSION

¶36    There was insufficient evidence to adjudicate J.D. as a YINC.  As such, we reverse and vacate the District Court's April 19, 2023 order adjudicating J.D. as a YINC and, likewise, vacate the District Court's subsequent December 11, 2024 Decree of Guardianship.


                                                    /S/ INGRID GUSTAFSON

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ BETH BAKER
/S/ KATHERINE M. BIDEGARAY


Chief Justice Cory J. Swanson, dissenting.

¶37    Youth in need of care cases are difficult and fact-intensive, and this one is a close call.  If this Court conducted de novo review over the District Court's adjudication decisions, then perhaps I would be persuaded to agree with the Court.  But we have a standard of review that is deferential to a district court because we recognize the difficulty of assessing the conduct of parents, their effect on their children, and many other factors involved in making decisions on child abuse and neglect cases.  The standard of review is

20

clearly erroneous for factual findings, and abuse of discretion for the court's decision on whether to declare a child a youth in need of care. *Matter of B.J.J.*, 2019 MT 129, ¶ 9, 396 Mont. 108, 443 P.3d 488. Here, the District Court's findings were not clearly erroneous, and the court did not abuse its discretion. I therefore respectfully dissent.

¶38 The Opinion is correct, the central question of this YINC determination is whether Mother was able to provide for J.D.'s basic necessities in light of her ongoing mental illness struggles. The District Court spent a sufficient amount of time reviewing the records, listening to witnesses, and observing Mother's conduct in the courtroom and through the entire proceedings. We should give the court's determinations the sufficient weight and deference required by law. Interestingly, the Opinion correctly states we instruct district courts to observe a "parent's past conduct to inform the exercise of its discretion" in these cases. Opinion, ¶ 20. The District Court followed our guidance, and we now find fault in its doing so.

¶39 For instance, we acknowledge the Department was justified in getting involved in this matter and removing J.D. when Mother was arrested and showing significant mental health concerns. Opinion, ¶ 21. We hold, however, since Mother was doing fine by the time of the adjudication hearing (only 5 weeks later), the petition should have been dismissed. The Court overlooks two salient facts upon which the District Court relied. First, the Mother was doing better in part because the Department had sought permission for emergency services to remove J.D. and assist Mother with mental health care. Second, Mother was not actually on the road to long-term stability. She had "a history of having episodes where she has thrown things at her son, including plates, books, etc.," and

21

"consistently demonstrate[d] out-of-control mental health" where she would "escalate rapidly," resulting in a concerning outburst. At the time of the adjudication hearing, she refused to engage in mental health services to address her mental health. Her episode of lucidity around the time of the adjudication hearing was not the result of long-term mental stability, but a transitory condition in the midst of a sustained state of mental illness. So, the Department's temporary aid was just that, and without Mother's willingness to address her long-term mental stability, the District Court was correct to determine J.D. was still at risk of neglect.

¶40 A second instance of the Opinion second-guessing the District Court without applying our standard of review, including in the light most favorable to the prevailing party below, Opinion ¶ 10, is when it discounts the District Court's concerns about Mother's emotional instability; off-label use of Narcan to treat her "hypnosis"; delusional statements about being threatened by the CIA, abducted by aliens, and having a device implanted in her brain; irrational and repeated calls to the police department; and admitted prior abuse of J.D. Opinion, ¶¶ 23, 26. The Opinion states these observed concerns happened outside of J.D.'s presence and are unrelated to J.D. One can't help but think the District Court reasonably determined these concerns were in fact related to J.D., due to the simple fact a mother experiencing this level of distress is not able to provide for the basic needs of her 14-year-old son.

¶41 The final point worth making is the error of dismissing signs of parental neglect when the child is a 14-year-old boy. As a former county attorney, I experienced no end of frustration with the Department when it downplayed the needs of teenagers who had

essentially become feral, surfing on whatever couch happened to be available in a small community, due to the complete lack of responsibility of neglectful parents. While a teenage boy or girl may be more self-sufficient than a toddler, they may also confront risks unique to their ages, such as substance abuse or sexual abuse by older teenagers or young adults. *See generally* Kevin M Simon et al., *Adolescent Substance Use Disorders*, 1.6 New England J. of Med. Evid., June 2022 https://perma.cc/8HFT-ULPD (risk factors for adolescent substance use disorder include familial instability and mental health conditions, high residential mobility, and history of trauma); Christine Banvard-Fox et al., *Sexual Assault in Adolescents*, 47.2 Primary Care: Clinics in Office Practice, June 2020, at 2, https://perma.cc/2JKB-FWAU ("It is estimated that two-thirds of minors who have experienced sexual abuse were 12 to 17 years old when it first occurred."). They are also the prime targeting age for human sex traffickers. *See* Hannabeth Franchino-Olsen, *Vulnerabilities Relevant for Commercial Sexual Exploitation of Children/Domestic Minor Sex Trafficking: A Systematic Review of Risk Factors*, 22.1 Trauma, Violence & Abuse, Jan. 2021, at 99, 100 https://perma.cc/6XDW-FNDG (average age of a victim estimated between 11 to 14 years old). In other words, they still need a functioning parent, and the Department still owes them a realistic safety assessment. When a district court makes a finding based upon evidence which is substantial (as it was in this case), then we should review it according to the correct standard. I would affirm.

/S/ CORY J. SWANSON

Justice Jim Rice joins the dissenting Opinion of Chief Justice Cory J. Swanson.

/S/ JIM RICE

23